Fay FRIEDMAN, Adam J. Meyer and Daniel Benhaim, Plaintiffs,

v.

Brenda SNIPES, in her official capacity as Broward County Supervisor or Elections and member of the Broward County canvassing board; Constance Kaplan, in her official capacity as Miami–Dade County Supervisor of elections and member of the Miami–Dade canvassing board; and Glenda Hood, in her official capacity as Florida Secretary of State, Defendants.

No. 04–22787–CIV–GOLD.

United States District Court, S.D. Florida.

Nov. 9, 2004.

Randall C. Marshall, ACLU Foundation of Florida, Inc., Miami, FL, Counsel for Plaintiffs.

JoNel Newman, Florida Legal Services, Inc., Miami, FL, Counsel for Plaintiffs.

Jeffrey P. Ehrlich & Susan Torres, Assistant County Attorneys, Miami–Dade County, Miami, FL, Counsel for Constance Kaplan, Miami–Dade Supervisor of Elections.

Edward G. Labrador, Matthew Cohen, Broward County Assistant Attorneys, Ft. Lauderdale, FL, Counsel for Brenda Snipes, Broward Supervisor of Elections.

Burnadette Norris–Weeks, Law Offices of Burnadette Norris–Weeks, Ft. Lauderdale, FL, Counsel for Brenda Snipes, Broward Supervisor of Elections.

Juan Enjamio, Daniel Fridman, Hunton & Williams, Miami, FL, Counsel for Glenda Hood, Florida Secretary of State.

### ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

GOLD, District Judge.

THIS CAUSE is before the Court upon Plaintiffs' Emergency Motion for a Temporary Restraining Order and/or Preliminary Injunction and Request for an Emergency Hearing [DE # 2, filed November 2, 2004] and their Corrected Memorandum in support thereof [DE # 9, filed November 2, 2004]. An emergency hearing was held on November 3, 2004 to discuss Plaintiffs' motion for a temporary restraining order pending an evidentiary hearing on Plaintiffs' request for a preliminary injunction. After hearing argument from the parties, I entered an Order Granting Temporary Restraining Order [DE # 15, filed November 3, 2004].[1] On November 5, 2004, I held an evidentiary hearing on Plaintiffs' request for a preliminary injunction. Counsel for Plaintiffs presented testimony from Plaintiffs Fay Friedman, Adam Meyer, Daniel Benhaim and from representatives for Defendants Brenda Snipes, Constance Kaplan and Glenda Hood. Plaintiffs also proffered evidence from Sai Jahann, John Greenbaum and Bonnie Daniels. I will discuss the testimony of each of the witnesses in greater detail below. Oral argument was held on November 9, 2004.

### I. The Parties

Plaintiffs, Fay Friedman, Adam J. Meyer and Daniel Benhaim (collectively the "Plaintiffs") are three voters registered in the State of Florida. (Compl.—Injunctive Relief Sought at ¶¶ 1, 4–6.) Defendants are Brenda Snipes, the Supervisor of Elections of Broward County, Florida, Constance Kaplan, the Supervisor of Elections of Miami–Dade County, Florida, and Glenda Hood, Secretary of State for the State of Florida (collectively the "Defendants"). (Id. at ¶¶ 7–9.) On November 2, 2004, Plaintiffs filed Complaint—Injunctive Relief Sought [DE # 1] in the United States District Court for the Southern District of Florida under 42 U.S.C. § 1983 for Defendants' alleged violations of Plaintiffs' rights under the Civil Rights Act of 1964, 42 U.S.C. § 1971(a)(2)(B), and the First and Fourteenth Amendments to the United States Constitution. (Id. at ¶ 25–27.) Plaintiffs allege that they each timely requested an absentee ballot but they (1) never received the requested absentee ballot or they (2) received the absentee ballot when it was too late for them to submit the absentee ballot to the Supervisor of Elections before 7 pm on the date of the election. (Id. at ¶¶ 10–11.)

This action does not name, as a party-Defendant, the Supervisor of Elections of any other county in the State of Florida. During the hearing on the motion for temporary restraining order, Plaintiffs' counsel acknowledged that this action was brought only on behalf of the three named Plaintiffs and that it was not a class action against Defendants.[2]

1. In my Order Granting Temporary Restraining Order [DE # 15], I ordered that Defendants Brenda Snipes and Constance Kaplan preserve and segregate all domestic absentee ballots postmarked by November 2, 2004 in order to preserve the *status quo* until such time as a full determination on the merits could be made. I did not make any further

determination as to any of the other requests for relief which the Plaintiffs had originally made.

2. Plaintiffs later submitted their First Amended Complaint—Class Action [DE # 18] on November 4, 2004.

## II. Relief Requested

Plaintiffs filed their original Complaint [DE # 1] and Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction [DE # 2] on November 2, 2004. In the original Complaint and Motion, Plaintiffs made three requests of the Court. First, Plaintiffs asked the Court to issue a declaratory judgment that Defendants may not reject any of Plaintiffs' absentee ballots and/or the ballots of any other qualified voters[3] which are postmarked by November 2, 2004 but received by Defendants between 7 p.m. on November 2, 2004 and midnight on November 12, 2004. (Motion at 1). Second, Plaintiffs sought a temporary restraining order and/or preliminary injunction which would require Defendants Brenda Snipes and Constance Kaplan to segregate and preserve any absentee ballot postmarked by November 2, 2004 but received by them after 7 p.m. on November 2, 2004 and before November 12, 2004 at midnight. (**Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction at 2.**) Third, Plaintiffs requested that I conduct an evidentiary hearing to determine whether preliminary and/or permanent injunctive relief is appropriate. (*Id.*)

Plaintiffs later filed a First Amended Complaint—Class Action [DE # 18]. In this amended complaint, Plaintiffs no longer request a preliminary injunction against Defendant Secretary of State Glenda Hood.[4] Plaintiffs continue to seek a preliminary injunction against Defendants Brenda Snipes and Constance Kaplan on the same three grounds raised in their original Complaint.

After reviewing the Amended Complaint, conducting an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction, entertaining legal argument from the parties regarding Plaintiffs' Motion for Preliminary Injunction and reviewing the applicable case law and statutes, I conclude that Plaintiffs have not met the necessary burden to establish that they are entitled to a preliminary injunction in this matter. I find that Plaintiffs have not shown a substantial likelihood that they will succeed on the merits of any of their claims under the Voting Rights Act, under the First and Fourteenth Amendments or under the Equal Protection Clause of the Fourteenth Amendment.[5]

## III. Facts Established During Evidentiary Hearing

### A. Testimony from Plaintiffs

#### 1. Fay Friedman

Fay Friedman ("Friedman") testified that she has been a registered voter in Broward County, Florida for seventeen

---

3. At oral argument on the legal briefs, Plaintiffs' counsel confirmed that he was seeking relief on behalf of the three named Plaintiffs as well as all other domestic absentee ballot voters who are similarly situated in Florida's 65 other counties. Plaintiffs have filed a Motion to Certify Class **[DE # 19, filed November 4, 2004].** I have not set this Motion for hearing, however. Consequently, I will only evaluate Plaintiffs' claims for preliminary injunction with respect to the three named Plaintiffs.

4. At the evidentiary hearing, Plaintiffs stipulated that they no longer request a preliminary injunction requiring Defendant Secretary of State Glenda Hood to count any domestic absentee ballots postmarked by November 2, 2004 but which are received after 7 p.m. on November 2, 2004. Rather, Plaintiffs request only a preliminary injunction and permanent injunction requiring Defendant Glenda Hood to "promulgate regulations, policies and procedures that treat all similarly situated absentee voters alike under Florida's election laws." (**First Amended Complaint—Class Action at 9.**)

5. For a discussion of the other reasons why I am denying Plaintiffs' request for a preliminary injunction, see *infra* n. 9.

(17) years. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 1; Evid. Hr'g at 5.) Friedman stated that she had intended to vote in person in the November 2, 2004 election in Florida, but that she sustained an injury "a number of weeks ago" while at her summer home in McKeesport, PA, which prevented her from returning to Florida. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 2; Evid. Hr'g at 6.) When Friedman realized she would be unable to return to Florida, she telephoned the office of the Broward Supervisor of Elections ("BSOE") on Friday, October 22, 2004 and requested that an absentee ballot be sent to her summer address in McKeesport. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 2; Evid. Hr'g at 6.) Friedman testified that she telephoned BSOE's office again on Thursday, October 28, 2004 when she still had not received her absentee ballot. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 3; Evid. Hr'g at 7.) The BSOE clerk with whom she spoke told her that her absentee ballot had been sent to her by mail on Monday, October 25, 2004. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 3; Evid. Hr'g at 7.) Friedman also testified that she was aware of news reports regarding problems with the United States Postal Service and the delivery of absentee ballots. (Evid. Hr'g at 12.)

On Friday, October 29, 2004, Friedman received at her McKeesport, PA an address a card from the Broward Country Democratic Executive Committee, thanking her for requesting an absentee ballot; but the mail did not contain the absentee ballot itself. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 4; Evid. Hr'g at 7.) Friedman then attempted to contact BSOE again, phoning a number of times and at one point, waiting on hold for an hour. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 5; Evid. Hr'g at 7.) Friedman finally gave up, without being able to reach a live person at the BSOE. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 5; Evid. Hr'g at 7.)

Friedman testified that later on the day of Friday, October 29, 2004, she spoke with her daughter, Diane Finston. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 6; Evid. Hr'g at 8.) Friedman testified that her daughter, who lives in California, had been calling the BSOE on her behalf. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 6; Evid. Hr'g at 8.) Friedman further testified that her daughter provided her with a BSOE "internal number." (Compl.—Injunctive Relief Sought, Ex. A at ¶ 6; Evid. Hr'g at 8.) According to Friedman, she phoned this number and spoke to a BSOE clerk who informed her that she would fax a replacement absentee ballot for Friedman to Friedman's son, Gary Friedman, who lives near McKeesport in Pittsburgh, PA. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 6; Evid. Hr'g at 8.) According to Friedman, when no fax arrived, she phoned the same internal number and spoke to another clerk, who verified the fax number and informed her that the fax would be arriving shortly. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 6; Evid. Hr'g at 8.) Friedman testified that her son never received the fax. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 6; Evid. Hr'g at 8.)

Friedman testified that towards the end of the business day on Friday, October 29, 2004, she again spoke with her daughter. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 7; Evid. Hr'g at 9.) According to Friedman, her daughter informed her that she had spoken to BSOE and was assured that BSOE had sent Friedman an absentee ballot via Federal Express. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 7; Evid. Hr'g at 9–10.) Friedman testified that the absentee ballot did not arrive on Saturday, October 30, 2004, or on Monday, November 1, 2004. (Compl.—Injunctive Relief Sought, Ex. A at ¶ 8.)

On November 2, 2004, Federal Express delivered Friedman's absentee ballot to her McKeesport, PA address. (**Compl.— Injunctive Relief Sought, Ex. A at ¶ 9; Evid. Hr'g at 10.**) Friedman took about thirty (30) minutes to fill out the absentee ballot and then gave it back to Federal Express for delivery to BSOE. (**Compl.— Injunctive Relief Sought, Ex. A at ¶ 10; Evid. Hr'g at 10.**) The Federal Express delivery person indicated to Friedman that the ballot would reach the BSOE on Wednesday, November 3, 2004. (**Compl.—Injunctive Relief Sought, Ex. A at ¶ 10; Evid. Hr'g at 10.**)

Friedman concluded her testimony by indicating that voting is her "civic duty" and an "obligation." (**Evid. Hr'g at 11.**) She stated that voting is "extremely" important to her and that while she does not anticipate having to vote by absentee ballot again, she will vote by absentee ballot if necessary. (*Id.*)

### 2. Adam J. Meyer

Adam J. Meyer ("Meyer") testified that he is a registered voter in Miami–Dade County, Florida currently living in Gainesville, Florida where is he attending school. (**Compl.—Injunctive Relief Sought, Ex. B at ¶ 1; Evid. Hr'g at 18.**) Meyer testified that he knew he would not be able to vote in Miami and thus visited Miami– Dade's website to search for a phone number for the elections department. (**Evid. Hr'g at 18.**) According to Meyer, he located the number and called the elections department. (*Id.*) While on hold, Meyer found an on-line absentee ballot request form. (*Id.* at 18–19.) Meyer stayed on the phone and when his call was answered, he asked the person at the Miami–Dade elections office several questions to ensure that he had filled out the on-line form properly. (*Id.* at 19.) Meyer also asked

the gentleman with whom he spoke how long it would take to receive the ballot. (**Compl.—Injunctive Relief Sought, Ex. B at ¶ 3; Evid. Hr'g at 19.**) Meyer was informed that the Miami–Dade elections department was sending out absentee ballots everyday and that it would take two days for him to receive his ballot. (**Compl.—Injunctive Relief Sought, Ex. B at ¶ 3; Evid. Hr'g at 19.**)

Meyer testified that he printed the absentee ballot request form on Wednesday, October 20, 2004 and deposited it in a United States Postal Service mailbox on the corner of West University Avenue and North–South Drive in Gainesville, Florida on Thursday, October 21, 2004. (**Compl.—Injunctive Relief Sought, Ex. B at ¶ 2; Evid. Hr'g at 21–23.**) During cross-examination, counsel for Defendant Constance Kaplan, the Supervisor of Elections of Miami–Dade County, Florida, asked Meyer if he could explain a postmark date of October 25, 2004 on his absentee ballot request form. (*Id.* at 22.) Meyer stated that he could not. (*Id.*)

Meyer testified that he did not know when his absentee ballot request form was received by the Miami–Dade elections department. (*Id.* at 23.) Meyer testified that he still had not received his absentee ballot on Monday, November 1, 2004. (*See id.*) He then testified that around 12:30 p.m. on Monday, November 1, 2004, his girlfriend checked his mailbox but that there was no mail. (*Id.* at 23–24.) According to Meyer, he next checked his mailbox at 7:00 p.m. of that day and found that his absentee ballot had been delivered. (**Compl.—Injunctive Relief Sought, Ex. B at ¶ 4; Evid. Hr'g at 24.**) Meyer stated that the postmark date on the envelope containing his absentee ballot was October 30, 2004.[6] (**Evid. Hr'g at 24.**)

---

6. Plaintiffs submitted into evidence a faxed copy of the postmarked envelope. (**See Evid.** **Hr'g at 20.**)

Meyer testified that he took about thirty-to-forty-five minutes to fill out his ballot. (*Id.*) He then searched the Federal Express website for drop-off points and times in order to try to overnight his ballot to the Supervisor of Elections. (*Id.*) Meyer concluded that it was too late for him to overnight his ballot. (*Id.*)

Meyer testified that around 11:00 a.m. or 12:00 p.m. on Tuesday, November 2, 2004, he went to a United States Postal Service office in Gainesville, FL and mailed his absentee ballot. (*Id.* at 20, 25; *see also* Compl.—Injunctive Relief Sought, Ex. B at 5.) Meyer explained that he knew that he was sending his ballot on Election Day but that he hoped that it would be counted regardless. (*Id.* at 21.) On cross-examination, counsel for Defendant Constance Kaplan, the Supervisor of Elections of Miami–Dade County, Florida, asked Meyer whether he had considered driving from Gainesville to Miami–Dade County in order to vote in person. (*Id.* at 24.) Meyer replied that he would not have been able to make the drive because he had class and work on November 2, 2004 and that it was a six-hour drive to Miami from Gainesville. (*Id.* at 25.)

### 3. Daniel Benhaim

Daniel Benhaim ("Benhaim") testified that he is a registered voter in Miami–Dade County, Florida currently living in Orlando, Florida, where he is a student at the University of Central Florida. (Compl.—Injunctive Relief Sought, Ex. C at ¶ 1–2; Evid. Hr'g at 26–27.) Benhaim stated that in early October 2004, he requested an absentee ballot to be sent to his college address in Orlando. (Compl.—Injunctive Relief, Ex. C at ¶ 2.) Benhaim testified that this absentee ballot request form was returned to his address in Miami–Dade County in mid-October because some of the information which Benhaim had supplied was incomplete. (Compl.—Injunctive Relief Sought, Ex.

C at ¶ 3; Evid. Hr'g at 28, 32.) According to Benhaim, he instructed his mother to complete the form on his behalf and to send it back to the elections department. (Evid. Hr'g at 28.) On cross-examination, Benhaim admitted that he had his mother sign his name on his behalf despite the fact that the form contains an oath that appears above the signature line. (Evid. Hr'g at 33.) On cross-examination, counsel for Defendant Constance Kaplan, the Supervisor of Elections of Miami–Dade County, Florida, also asked Benhaim whether he would dispute that his absentee ballot request form was postmarked October 26, 2004. (*Id.* at 33.) Benhaim replied that he thought his mother had mailed his absentee ballot request form on the week of October 24, 2004, but that he could not say for certain whether she mailed it on Sunday, October 24, 2004 or Monday, October 25, 2004. (*Id.* at 34.)

Benhaim testified that when he had not received his absentee ballot by 12:00 p.m. or 1:00 p.m. on Friday, October 29, 2004, he called the Miami–Dade County office of the Supervisor of Elections and was told that it would send him an absentee ballot by overnight mail. (Compl.—Injunctive Relief Sought, Ex. C at ¶ 4; Evid. Hr'g at 28–29, 36–37.) Benhaim testified that he did not receive his absentee ballot on either Saturday, October 30, 2004 or Monday, November 1, 2004. (Compl.—Injunctive Relief Sought, Ex. C at ¶ 5; Evid. Hr'g at 29.) According to Benhaim, when he had not received his ballot by Monday, November 1, 2004, he contacted the Election Protection Hotline. (Compl.—Injunctive Relief Sought, Ex. C at ¶ 6; Evid. Hr'g at 29.) Based on the advice he received from the Election Protection Hotline, Benhaim downloaded a federal write-in ballot, filled it out, and mailed it on Tuesday, November 2, 2004. (Compl.—Injunctive Relief Sought, Ex. C At ¶ 6; Evid. Hr'g at 29–30.) Benhaim

explained that after he mailed in his federal write-in ballot, he received his absentee ballot, via regular mail, rather than priority or overnight mail, around 2:00 p.m. on Tuesday, November 2, 2004; it was postmarked Saturday, October 30, 2004. (**Evid. Hr'g at 30, 35.**) Benhaim stated that he did not consider driving down to Miami–Dade County, Florida to vote in person because of his prior obligations at school. (***Id.* at 35.**)

Benhaim concluded his testimony by stating that it is "very important" that his vote be counted in this election. (***Id.* at 31.**) He feels that it is his right as a United States citizen to vote and that as a registered voter, he has a right to have his "voice count." (***Id.***) Benhaim anticipates having to vote by absentee ballot again because he is a student who does not reside at his permanent address in Miami–Dade County, Florida. (***Id.***)

## B. Testimony of Defendants' Representatives

### 1. *Mary Hall*

Mary Hall ("Hall"), director of the absentee ballot department of the Broward County Supervisor of Elections office, testified on behalf of Defendant Brenda Snipes. (**Evid. Hr'g at 38–39.**) Hall acknowledged that Fay Friedman was a qualified registered voter in Broward County and that she had requested an absentee ballot on Friday, October 22, 2004. (***Id.* at 39.**) According to Hall, two absentee ballots were sent to Friedman, the second one via Federal Express. (***Id.***) But Hall stated that she could not provide any signed receipt or proof of delivery of the absentee ballot that was sent via Federal Express to Friedman from the Supervisor of Elections. (***Id.* at 40.**)

Hall testified that the department sent approximately 4300 absentee ballots on October 28 and 29, 2004 via Federal Express because of problems with the United States Postal Service's delivery of absentee ballots.[7] (***Id.* at 40–41, 58; *see also id.* at 62.**) Hall stated that the department had a number of signed receipts for those that were sent out on October 28 and 29, 2004, and received on Saturday, October 30, 2004 and Monday, November 1, 2004. (***Id.* at 41.**) But Hall was unable to testify as to how many signed receipts her department had in its possession. (***Id.***) Hall indicated that the department mailed approximately 9,000 absentee ballots on Saturday, October 31, 2004;[8] none were mailed on Monday, November 1, 2004. (***Id.* at 42, 58, 62.**) Hall, however, did not know how many of these 13,300 total absentee ballots were returned. (***Id.* at 62.**)

Counsel for the Plaintiffs, asked Hall whether Friedman's ballot would be rejected if it had been received on Wednesday, November 3, 2004. (***Id.* at 42.**) Hall indicated that Friedman's ballot would be rejected because it would not be considered a "valid ballot." (***Id.***) Hall explained that "[t]he law says that the ballot needs to be in the hands of the supervisor of elections by 7 p.m. on election day" and thus any ballot not received after 7 p.m. on Tuesday, November 2, 2004 would be rejected, regardless of whether it was postmarked

---

**7.** Neither the Florida Statutes nor the Florida Administrative Code require Supervisors of Election to send, via Federal Express, absentee ballots when registered voters request absentee ballots and have not received them within days of the election. The Broward County Supervisor of Elections office went above and beyond the requirements of the Florida law in their attempt to correct a mistake that was no fault of their own. As discussed below, the Miami–Dade County Supervisor of Elections office is also without fault for the delays in receiving and processing Plaintiffs' absentee ballot requests.

**8.** These 9,000 ballots were sent via regular mail to residents in Broward County. (**Evid. Hr'g at 58.**)

before November 2, 2004. (*Id.* at 42–43.) Hall clarified, however, that the department has not processed any of the ballots received after the 7 p.m. deadline. (*Id.* at 42.)

Hall testified that the BSOE received after 7 p.m. on Tuesday, November 2, 2004 and continues to receive overseas ballots that are postmarked on or before November 2, 2004 and that these ballots are counted. (*Id.* at 43.) According to Hall, BSOE will count these ballots will count these ballots up until midnight on the tenth day following the election. (*Id.* at 43–44.) It does not matter when the overseas voter received the ballot, Hall explained, as long as the ballot is received by midnight on the tenth day after the election. (*Id.* at 44.) It also does not matter, Hall stated, where the overseas voter is located; voters in Canada and Mexico are treated the same as overseas voters. (*Id.*)

Counsel for the Plaintiffs then posed a hypothetical situation to Hall. (*Id.* at 44–46.) Counsel for Plaintiffs asked Hall to envision a voter in Detroit, Michigan and a voter across the bridge in Windsor, Ontario. (*Id.*) If both mailed their ballots on November 2, 2004 and both ballots arrived in the Broward County Supervisor of Elections office two days later, counsel for the Plaintiffs asked whether the ballot from Windsor, Ontario would count, but the ballot from Detroit, Michigan would not. (*Id.* at 45–46.) Hall stated that the Windsor, Ontario ballot would indeed count and that the Detroit, Michigan ballot would not. (*Id.*)

Hall next testified that she was aware that a number of voters received their absentee ballots too late to return them by 7 p.m. on election day and that her office had received numerous complaints from voters that they did not receive their absentee ballots in a timely fashion. (*Id.* at 46.) Based on her past experience, Hall stated that she expected to continue receiving domestic absentee ballots from voters postmarked on or before November 2, 2004, but that these ballots would be rejected because they would have arrived after the 7 p.m. deadline on Tuesday, November 2, 2004; ballots from overseas absentee voters would be counted, however. (*Id.*)

During cross-examination, Hall testified that after receiving complaints from people who had not timely received their absentee ballots, Defendant Brenda Snipes visited the United States Postal Service to discuss the problem. (*Id.* at 48.) Hall disputed that the number of missing absentee ballots was as high was what the local newspapers reported. (*Id.* at 62.) But Hall testified that her office was aware of a widely-publicized internal memo within the United States Postal Service that acknowledged the problems regarding the absentee ballots. (*Id.* at 59.) Hall testified that based on the problems with the United States Postal Services, Snipes decided to send via Federal Express absentee ballots to any Broward County registered voters who was out of the county who had requested an absentee ballot but who had not returned the absentee ballot by October 22, 2004. (*Id.* at 49–50.) Defendant Brenda Snipes continued to use the United States Postal Service for mailing absentee ballots to individuals who had requested them but who lived within Broward County. (*Id.* at 50.)

Counsel for Brenda Snipes, the Supervisor of Elections of Broward County, Florida, entered into evidence a printout from the Broward County Supervisor of Elections office regarding the absentee ballot request screen. (*Id.* at 47.) Requesting that Hall examine the printout, counsel for Brenda Snipes, the Supervisor of Elections of Broward County, Florida, asked Hall to verify the dates on which Friedman requested an absentee ballot. (*Id.* at 48.)

Hall testified that Friedman requested an absentee ballot on Friday, October 22, 2004 and that a ballot was mailed on Monday, October 25, 2004. (*Id.* at 48, 55.) Looking at the printout, Hall also testified that an absentee ballot was sent via Federal Express to Friedman on Friday, October 29, 2004. (*Id.* at 51, 55.) She then stated that if the absentee ballot had been sent via Federal Express on Friday, October 29, 2004, Friedman would have received it by Monday, November 1, 2004. (*Id.* at 56.)

Hall then testified about a hotline that the Supervisor of Elections of Broward County, Florida set up to assist with the requests for absentee ballots. (*Id.* at 51.) Established at the EEOC, the hotline was staffed with county employees who took requests from anyone that called about an absentee ballot. (*Id.*) For each request, the Supervisor of Elections of Broward County, Florida sent out an absentee ballot, via mail or Federal Express, depending on the location of the person making the request. (*Id.*) The absentee ballots that were sent via Federal Express contained an envelope in which voters could place their ballots and return them to the office. (*Id.*) Both the outgoing Federal Express package and the return envelope were paid for by Broward County. (*Id.* at 52, 56.) According to Hall, voters who received their ballots and wanted to mail them back the same day could do that; all they would need to do is check the "same-day service" box on the FedEx return envelope. (*Id.* at 56.) Hall, however, was not aware of any absentee ballots that were returned via Federal Express's same-day service. (*Id.* at 61.)

Hall continued her testimony by explaining that there was nothing in the law that required absentee ballots to be mailed out within a particular time. (*Id.* at 54.) Hall testified that this was the first time in her experience where absentee ballots were sent via Federal Express in order to help voters receive them in a timely fashion. (*See id.* at 57.) Hall asserted that Defendant Brenda Snipes attempted to everything possible for all qualified voters to vote by absentee ballot. (*Id.* at 58.)

On re-direct, counsel for the Plaintiffs asked Hall how she knew that Friedman's ballot was sent via Federal Express on October 29, 2004. (*Id.* at 60.) Hall replied that she knew Friedman's ballot was sent via Federal Express on this date because "that's the date we were doing Fe-dEx." (*Id.*) But upon further questioning from Plaintiffs' counsel, Hall could not state with certainty that Friedman's ballot had indeed been sent via Federal Express. (*Id.*) On re-cross examination, Hall stated that the printout indicated that Friedman's request for an absentee ballot was a "duplicate request." (*Id.* at 63.)

### 2. Alicia Acosta

Alicia Acosta ("Acosta") testified on behalf of Constance Kaplan, the Supervisor of Elections of Miami–Dade County, Florida. (**Evid. Hr'g at 64.**) Acosta testified that Meyer is a properly registered voter in Miami–Dade County and that he timely requested an absentee ballot. (*Id.*) According to Acosta, the Miami–Dade Supervisor of Elections office mailed Meyer an absentee ballot on Friday, October 29, 2004. (*Id.*) This ballot was not returned to the office by the 7 p.m. deadline. (*Id.* at 65.)

Acosta also testified that Benhaim is a properly registered Miami–Dade voter who requested an absentee ballot from the Supervisor's office via mail. (*Id.*) According to Acosta, this ballot was sent on Saturday, October 30, 2004. (*Id.*) Like Meyer's ballot, Benhaim's was not returned to the office by the 7 p.m. deadline. (*Id.* at 66.)

Acosta testified that the 7 p.m. deadline is a state law, rather than an internal

office policy, and that it applies only to voters who mail their absentee ballot from within the United States; it does not apply to voters mailing ballots from outside of the United States. (*Id.* at 66, 72.) Canada, according to Acosta, is considered "overseas" and thus voters sending absentee ballots from Canada do not have to return their ballots by 7 p.m. on November 2, 2004, regardless of when they receive their ballots. (*Id.* at 67.)

Counsel for the Plaintiffs asked Acosta whether the Supervisor of Elections of Miami–Dade County, Florida received any complaints from voters who did not receive their absentee ballots in a timely manner before the November 2, 2004 election. (*Id.*) Acosta replied that the office had received such complaints. (*Id.*) Counsel for the Plaintiffs also asked Acosta whether the office had mailed ballots on Saturday, October 30, 2004. (*Id.* at 68–69.) Acosta replied that ballots had been sent on Saturday, October 30, 2004, but that to her knowledge, none were sent on Monday, November 1, 2004. (*Id.* at 69.)

Acosta then testified that she anticipated that she would continue to receive absentee ballots after the 7 p.m. deadline on November 2, 2004 and that some of these ballots would contain postmark dates prior to November 2, 2004. (*Id.*) Acosta explained that if the ballots received were from overseas voters, they would be counted up until ten days after the election but that if they were received from domestic absentee voters, they would not be counted. (*Id.* at 69–70.)

On cross-examination, counsel for Defendant Constance Kaplan, Supervisor of Elections of Miami–Dade County, Florida introduced into evidence Defense Exhibit # 2, which contained three pages—an absentee ballot request form, a copy of the envelope in which that form was received, and a printout of the information inputted into the Supervisor of Elections database.

(**Evid. Hr'g** at 70.) Acosta then testified that the envelope which contained Meyer's absentee ballot request form bore a postmark date of October 25, 2004 and that the office records indicated that this request was received by the Supervisor of Elections of Miami–Dade County, Florida at 6:58 p.m. on October 27, 2004. (*Id.* at 71.) Acosta further testified that the records revealed that Meyer's absentee ballot was mailed to him on Friday, October 29, 2004. (*Id.*)

Regarding Benhaim's absentee ballot, Acosta examined the Defense Exhibit # 2 and stated that the postmark on the envelope in which he sent his absentee ballot request form was Monday, October 26, 2004, that the office received his request form on Tuesday, October 27, 2004 at 7:01 p.m., and that the office sent Benhaim an absentee ballot on Saturday, October 30, 2004. (*Id.* at 71–72.)

### 3. Sara Jane Bradshaw

Sara Jane Bradshaw ("Bradshaw"), Assistant Director of the Division of Elections, testified on behalf of the Defendant Secretary of the State Glenda Hood. (*Id.* at 74–75, 77.) Prior to her testimony, counsel for the Defendant Glenda Hood presented this Court with a stipulation reached by Plaintiffs and Defendant Glenda Hood as to the scope of questioning of the Secretary of State's representative. (*Id.* at 76.) In this stipulation, the parties agreed that Bradshaw would not testify to the law, only as to how the Secretary of State's office interprets Florida Statute § 101.672 and Florida Administrative Code § 1S–2.013. (*Id.* at 77.) Bradshaw testified that the Secretary of State's office instructs county Supervisors of Elections as to the laws regarding absentee ballots. (*Id.* at 78.) Bradshaw explained that under Florida Statute § 101.67(2), the Supervisors of Elections must reject the ballots from any person mailed within the United

States if not received by 7 p.m. on Election Day. (*Id.*) Bradshaw further explained that this same subparagraph does not require the rejection of absentee ballots received from voters outside the United States if those ballots are postmarked on or before November 2, 2004. (*Id.* at 78–79.)

Bradshaw next testified that the statute requires an overseas ballot to be mailed to absentee voter forty-five (45) days prior to the election. (*Id.* at 79.) Overseas, Bradshaw clarified, includes Canada, but not Puerto Rico, Guam, or the United States Virgin Islands. (*Id.* at 79–80.)

On cross-examination, Bradshaw stated that the Secretary of State does not have any discretion in applying Florida Statute § 101.67(2), nor does she have any discretion in applying Florida Administrative Code § 1S–2.013 or the consent decree. (*Id.* at 81.) On redirect, Bradshaw clarified that the Secretary of State has rule-making authority and that § 1S–2.013 was promulgated by the Secretary of State in compliance with the consent decree. (*Id.* at 82.) The consent decree, Bradshaw explained, did not specifically instruct the Secretary of State to promulgate § 1S–2.013; rather, it required the Secretary of State to create a plan of compliance and this was the method by which the Secretary of State chose to comply.[9] (*Id.* at 82–83.)

Following redirect examination, I asked Bradshaw whether the Secretary of State has any authority to instruct the Supervisor of Elections in a given county to count absentee ballots received after 7 p.m. on November 2, 2004. (*Id.* at 83.) Bradshaw responded that the Secretary of State does not have any discretion in this matter, nor does she have any rule-making authority or any other authority to so direct a Supervisor of Elections. (*Id.* at 83–84.)

C. Additional Testimony Proffered by Plaintiffs

Plaintiffs' counsel proffered testimony from three individuals, Sai Jahann, John Greenbaum and Bonnie Daniels. (**Evid. Hr'g** at 84–89.) Defendants' counsel objected to the proffered testimony of all three individuals. (*Id.* at 86, 87, 89–90.) In opposition to the proferred testimony, defense counsels stated that this was the first time that they had received notice of Plaintiffs' intent to introduce this evidence, thus they had no opportunity to investigate these allegations. (*Id.* at 86, 87, 89–90.) Defense counsels also objected on the grounds that this testimony was hearsay. (*Id.* at 87, 89–90.) At the evidentiary hearing, I accepted the proffer subject to the objections. (*Id.* at 86, 88, 90.) After considering the arguments of the parties at the evidentiary hearing as well as in the briefs submitted, I decline to accept Plaintiffs' proffered testimony. Plaintiffs attempted to introduce this testimony without notice to Defendants and the testimony was not based on any preliminary affidavit Plaintiffs provided to the Defendants or to the Court. This testimony also violates the hearsay rule, Fed.R.Evid. 802, and does not qualify under any hearsay exception.

IV. **Standard for Preliminary Injunction**

■ The Eleventh Circuit has stated that the "grant or denial of a preliminary injunction is a decision within the sound discretion of the district court." *Sierra Club v. Georgia Power Co.*, 180 F.3d 1309,

---

9. At oral argument, Plaintiffs' counsel acknowledged that the plan of compliance was approved by an order of the United States District Court for the Northern District of Florida, see *infra* n. 17 and discussion in text, *infra* p. 1376.

1311 (11th Cir.1999). The Eleventh Circuit requires the party moving for a preliminary injunction to meet four factors: (1) the moving party demonstrates a substantial likelihood on the merits; (2) the preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would cause to the non-moving party, and (4) the preliminary injunction would not be adverse to the public interest. *See Parker v. State Bd. of Pardons and Paroles,* 275 F.3d 1032, 1034 –1035 (11th Cir.2001) (citing *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir. 1985); *see also Warren Pub., Inc. v. Microdos Data Corp.,* 115 F.3d 1509, 1516 (11th Cir.1997); *Teper v. Miller,* 82 F.3d 989, 992 n. 3 (11th Cir.1996); *Ingram v. Ault,* 50 F.3d 898, 900 (11th Cir.1995) (citing *Gresham Park Cmty. Org. v. Howell,* 652 F.2d 1227, 1232 n. 7 (5th Cir.1981)); *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.,* 896 F.2d 1283, 1284 (11th Cir.1990) (citations omitted); *Haitian Refugee Center, Inc. v. Nelson,* 872 F.2d 1555, 1562 (11th Cir.1989) (citing *United States v. Alabama,* 791 F.2d 1450, 1459 n. 10 (11th Cir.1986)); *Canal Auth. of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974) (citations omitted). Accordingly, Plaintiffs must meet each of these four requirements before the Court can issue a preliminary injunction. Applying these well-established principles to the facts of this case, I conclude that Plaintiffs have not established sufficient evidence to support a finding in their favor on each of these four elements, and therefore, Plaintiffs are not entitled to a preliminary injunction.[10]

**10.** Because I have determined that Plaintiffs have failed to establish a likelihood of success on the merits of any of their claims, I need not discuss the remaining three factors of the preliminary injunction test. *See Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994) (stating that "[b]ecause we conclude that the plaintiffs failed to establish a substantial likelihood of success on the merits, we will not address the three other prerequisites of preliminary injunctive relief.") I find, however, that even if I were to conduct a complete analysis of Plaintiffs' claims under all of the elements of the preliminary injunction test, Plaintiffs are not entitled to a preliminary injunction because they do not meet the other elements of the preliminary injunction test.

Plaintiffs have not shown that they face an irreparable injury which is actual and imminent. *Siegel v. Lepore,* 234 F.3d 1163, 1177 (11th Cir.2000). At oral argument, counsel for Plaintiffs attempted to distinguish *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), by arguing that in seeking a preliminary injunction, Plaintiffs were not challenging the outcome of the election. Plaintiffs' counsel stated that if I do not issue a preliminary injunction requiring Defendants to count Plaintiffs' votes, these votes will be "irrevocably and permanently lost." After questioning Plaintiffs' counsel on this point during the hearing on November 8, 2004, Plaintiffs' counsel admitted that, even if counted, Plaintiffs' votes would not change the outcome of the election. Plaintiffs' counsel acknowledged that the "immediate" need to have their votes counted rests on their desire to have the Court declare that Defendants had intruded upon their right to vote. This is not an "imminent" irreparable injury, and as a result, a preliminary injunction is not an appropriate remedy. Any determination that § 101.67(2) is unconstitutional in its application to Plaintiffs can be made at a later time.

Plaintiffs have also failed to establish that they face a threatened injury which outweighs any harm to Defendants should I grant this preliminary injunction. Given Plaintiffs' counsel's acknowledgment that counting Plaintiffs' votes will have no impact on the election and that it will not affect the certification of Florida's electoral votes, ordering Defendants to continue to set aside and count absentee ballots received after 7 p.m. on November 2, 2004 would require Defendants to reassign already overworked staff members who are attempting to finalize the final certification of the counties' vote totals. Therefore, the potential harm to Defendants outweighs any threatened injury to Plaintiffs. Lastly,

## V. Analysis

Florida's laws regarding electors and elections are set forth in Fla. Stat. §§ 100–107. Section 101.67(2) provides: "All marked absent electors' ballots to be counted must be received by the supervisor by 7 p.m. the day of the election." Fla. Stat. § 101.67(2). Florida Administrative Code § 1S–2.013 allows overseas absentee voters an additional ten (10) days after election day to return their ballots to the Supervisor of Elections in the county from which they requested the ballot in order for that ballot to be counted, provided that the overseas absentee ballot was postmarked by election day.[11]

Plaintiffs present three causes of action against Defendants.[12] First, Plaintiffs claim that Fla. Stat. § 101.67(2) deprives Plaintiffs of their rights under 42 U.S.C. § 1971(a)(2)(B) and is actionable pursuant to 42 U.S.C. § 1983. (First Amended Compl. at 7–8.) Second, Plaintiffs argue that Fla. Stat. § 101.67(2) deprives Plaintiffs of the right to vote in violation of the First and Fourteenth Amendments to the Constitution. (*Id.* at 8.) Third, Plaintiffs maintain that Florida Administrative Code § 1S–2.013(7), deprives Plaintiffs, domestic absentee voters, of their right to equal protection under the Fourteenth Amendment because their absentee ballots will not be counted unless they are received by

entry of a preliminary injunction for Plaintiffs would be adverse to the public interest in this case because, as I will discuss below, granting preliminary injunctive relief to Plaintiffs would result in my treating Plaintiffs differently from domestic absentee voters in all of Florida's other 65 counties whose ballots were rejected because they were received after 7 p.m. on November 2, 2004.

11. Under Florida Administrative Code § 1S–2.013(7):

With respect to the presidential preference primary and the general election, any absentee ballot cast for a federal office by an overseas elector which is postmarked or signed and dated no later than the date of the Federal election shall be counted if received no later than 10 days from the date of the Federal election as long as such absentee ballot is otherwise proper. Overseas electors shall be informed by the supervisors of elections of the provisions of this rule, i.e., the ten day extension provision for the presidential preference primary and the general election, and the provision for voting for the second primary.

Fla. Admin. Code § 1 S–2.013(7) (2004).

An "overseas elector" is defined by the Florida Administrative Code as:

Any citizen located outside the United States on election day who is eligible to vote in elections conducted by the State of Florida pursuant to the Federal Overseas Citizens Voting Rights Act of 1975, 42 U.S.C.1973dd–1; or any citizen located out-

side the United States on election day who is otherwise qualified to vote under Florida law and who is a member of a protected group under the Federal Voting Assistance Act, 42 U.S.C.1973cc(b) (i.e., members of armed forces while on active service and members of the Merchant Marines of the United States and spouses and dependents as those terms are used in the Federal Voting Assistance Act); and who has submitted a timely and proper request for an absentee ballot and is otherwise qualified to vote under Florida law.

Fla. Admin. Code § 1S–2.013(2) (2004).

12. In Plaintiffs' Memorandum of Law in Support of Emergency Motion for Preliminary Injunction [**DE # 30, filed November 8, 2004**], the second Memorandum of Law which they filed in this case, Plaintiffs raise an additional argument for the first time. Plaintiffs now claim that Defendants' policies violate not only their right to equal protection but also their right to due process of law. Because Plaintiffs failed to raise this argument in either their Complaint or their Amended Complaint, I will not consider this argument at this stage in the preliminary injunction proceedings. By raising this issue at this late stage in the preliminary injunction proceedings, Plaintiffs deprived Defendants of the opportunity to address and rebut this issue. I am not dismissing this claim, rather I am just not allowing Plaintiffs to raise due process of law as an argument in support of their motion for preliminary injunction.

the Supervisors of Election by 7 p.m. on election day. (*Id.*) In order to determine whether Plaintiffs have established that entry of a preliminary injunction is proper in this case, Plaintiffs must show that at least one of their three legal claims survives under all four prongs of the of preliminary injunction test.

### A. Substantial Likelihood of Success on the Merits

The first factor of the preliminary injunction test requires Plaintiffs to show that there is a substantial likelihood that they will succeed on the merits of their claims. I will analyze each of Plaintiffs' three claims in turn.

#### 1. Violation of Voting Rights Act, 42 U.S.C. § 1971(a)(2)(B)

The Eleventh Circuit has stated that "[t]he right to vote is ... a right of paramount constitutional significance, the violation of which permits federal court intercession." *Hall v. Holder,* 117 F.3d 1222, 1231 (11th Cir.1997). While it is undisputed that the right to vote is fundamental, this right it not absolute; it is subject to control by the States. *See, e.g., Bush v. Gore,* 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college.") (citing U.S. Const., Art. II, § 1.); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) ("The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote ...."); *Dunn v. Blumstein,* 405 U.S.

330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (stating that the " 'equal right to vote' is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." (internal citation omitted)). Thus, although I have an obligation to ensure that a state does not engage in the "arbitrary and disparate treatment of the members of its electorate," *Bush v. Gore,* 531 U.S. at 105, 121 S.Ct. 525, in assessing Plaintiffs claims, I must also not act in a manner that would contravene the well-established and long-held principle that States " 'have broad powers to determine the conditions under which the right of suffrage may be exercised.' " *McDonald v. Bd. of Election Comm'rs of Chicago,* 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (quoting *Lassiter v. Northampton County Bd. of Elections,* 360 U.S. 45, 50, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959)). This is especially true in the context of absentee ballots, because there is no fundamental right to vote by absentee ballot. *See id.*

Plaintiffs argue that Fla. Stat. § 101.67(2) in tandem with Florida Administrative Code § 1S–2.013(7) results in disparate treatment for domestic and overseas absentee voters in violation of the Voting Rights Act. The Voting Rights Act provides:

> No person acting under color of law shall ... deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote ....

42 U.S.C. § 1971(a)(2)(B) (2003).[13] This section, often referred to as "the materiali-

---

**13.** In *Schwier v. Cox,* 340 F.3d 1284, 1297 (11th Cir.2003), the Eleventh Circuit held that "the provisions of section 1971 of the Voting

Rights Act may be enforced by a private right of action under § 1983."

ty provision," *Schwier v. Cox,* 340 F.3d 1284, 1297 (11th Cir.2003), was designed to eliminate practices that could encumber an individual's ability to *register* to vote. According to the *Schwier* Court:

> 42 U.S.C. § 1971(a)(2)(B) of the Voting Rights Act ... forbids the practice of disqualifying potential voters for their failure to provide information irrelevant to determining their eligibility to vote. This provision was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters. *See Condon v. Reno,* 913 F.Supp. 946, 949–50 (D.S.C.1995). For example, one 'such tactic[ ] [was to] disqualify[ ] an applicant who failed to list the exact number of months and days in his age.' *Id.*

*Id.* at 1294.[14]

In *Schwier,* voter registrants brought suit against the Secretary of State of the State of Georgia, seeking declaratory and injunctive relief on the grounds that Georgia's requirement that prospective voters provide their social security numbers violated 42 U.S.C. § 1971(a)(2)(B). *Id.* at 1285, 1296. More specifically, the voter registrants in *Schwier* alleged that social security numbers were not relevant or "material" to determining their eligibility to vote under Georgia law. *Id.* at 1287. Other cases from other jurisdictions alleging violations of 42 U.S.C. § 1971(a)(2)(B) have similarly focused on the "material" issue. *See, e.g., Hoyle v. Priest,* 265 F.3d

699, 704 (8th Cir.2001) (holding that an Arkansas voting initiative procedure which required petition signers to be "qualified electors" was material and outside the scope of 42 U.S.C. § 1971(a)(2)(B)); *Howlette v. City of Richmond, Virginia,* 485 F.Supp. 17, 21–22 (E.D.Va.1978) (holding that a city referendum procedure which required that the signatures of qualified voters on a referendum petition be verified by a notary and subjecting those who take the oath to possible criminal liability for perjury was not "immaterial" and thus did not violate 42 U.S.C. § 1971(a)(2)(B)).

■ Nothing in my review of the case law in this jurisdiction or in other jurisdictions indicates that section 1971(a)(2)(B) was intended to apply to the counting of ballots by individuals *already deemed qualified to vote.* Nor does case law in this jurisdiction or in other jurisdictions set forth a test for determining a violation of § 1971(a)(2)(B). Nevertheless, based on the express language of the provision, I will assess whether Defendants denied Plaintiffs' their right to vote because of any 1) error or omission; 2) on any record or paper; 3) relating to any application, registration, or other act requisite to voting; 4) if such error or omission is not material in determining whether such individual is qualified under State law to vote.

Plaintiffs argue that Defendants erred by omitting absentee ballots postmarked on or before November 2, 2004 but received between 7 p.m. on November 2 and 12 a.m. on November 12. **(See Corrected Memorandum in Support of Plaintiffs' Emergency Motion for a Temporary Re-**

---

**14.** Courts in other jurisdictions have described in similar fashion the purpose of 42 U.S.C. § 1971(a)(2)(B). For example, in *McKay v. Altobello,* Civ.A.No. 96–3458, 1996 WL 635987, at *1 (E.D.La. Oct.31, 1996), the Eastern District of Louisiana stated:

> [Section] 1971 is an anti-discrimination statute designed to eliminate the discrimi-

natory practices of registrars through arbitrary enforcement of registration requirements. It addresses errors and accidental omissions in registration, not the intentional refusal to provide required information.... This section is intended to prevent racial discrimination at the polls ....
> *Id.* at *1–2.

straining Order and/or Preliminary Injunction and Request for an Emergency Hearing, DE 9, at 9.) In deciding whether section 1971(a)(2)(B) prohibits the Supervisors of Elections from rejecting absentee ballots received after 7 pm on November 2, I must look first to the plain meaning of the statute. *See, e.g., Solis–Ramirez v. U.S. Dept. of Justice,* 758 F.2d 1426, 1430 (11th Cir.1985) ("[I]t is a well established axiom of statutory interpretation that in construing a statute, courts must first look to the plain meaning of the statute itself."). Section 1971(a)(2)(B) prohibits states from disqualifying potential voters based on "an error or omission *on any record or paper.*" Plaintiffs do not allege that their ballots were rejected because of some error or omission in filling out the absentee ballots. Plaintiffs do not allege that the error or omission occurred on the ballot itself. What Plaintiffs contend is that Defendants erred by omitting *the ballot as a whole* from the batch of absentee ballots to be counted. In other words, Plaintiffs would have me read the provision as "an error or omission on any record or paper *or any error or omission in the treatment, handling, or counting of any record or paper.*" The plain meaning of section 1971(a)(2)(B) simply does not support the expansive interpretation which the Plaintiffs advocate.

Plaintiffs next argue that the capacious definition of "vote" in section 1971(e) requires me to find that Defendants committed an error by failing to count Plaintiffs' ballots. Section 1971(e) states:

the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public of-

fice and propositions for which votes are received in an election

42 U.S.C. § 1971(e) (2003).[15] Plaintiffs argue that because the word "vote" in section 1971 "includes all action necessary to make a vote effective including ... having such ballot counted and included in the appropriate totals of votes cast," Defendants' refusal to count the absentee ballots postmarked on or before November 2, 2004 but received between 7 p.m. on November 2 and 12 a.m. on November 12 constitutes an omission that violated the Voting Rights Act.

Plaintiffs' argument fails because courts will avoid an interpretation of a statute that "renders some words altogether redundant." *United States v. Alaska,* 521 U.S. 1, 59, 117 S.Ct. 1888, 138 L.Ed.2d 231 (1997) (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). If "vote" means "all action necessary to make a vote effective including registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast," then such a definition should include the more limited phrase "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." Congress may well have been concerned about denials of the right to vote at all stages and components of the voting process—from application to registration to casting to counting—but section 1971(a)(2)(B) provides specifically for protections against denials based on errors or omissions on "records or papers" that are immaterial to the determination of an individual's qualification to vote. The error and omission alleged here did not pertain to determining eligibility to vote. Plaintiffs' application of

**15.** Section 1971(a)(3)(A) provides that "the term 'vote' in 42 U.S.C. § 1971(a)(2)(B) shall have the same meaning as in subsection (e) of this section ...." 42 U.S.C. § 1971(a)(3)(A).

"vote" and broader interpretation of section 1971(a)(2)(B) renders redundant the more narrow protection of the provision.

Because the error and omission alleged here did not occur on any record or paper and did not occur in relationship to a determination of the Plaintiffs' eligibility to vote, Plaintiffs have not established a substantial likelihood of success on the merits of a claim of violation of 42 U.S.C. § 1971(a)(2)(B). As a result, Plaintiffs are not entitled to a preliminary injunction for alleged violations of 42 U.S.C. § 1971(a)(2)(B).

## 2. Violation of the First and Fourteenth Amendments to the Constitution

As I have concluded that Plaintiffs do not have a substantial likelihood of success on the merits of their Voting Rights Act claim, I must next analyze whether Plaintiffs have demonstrated a substantial likelihood of success on their claim that Defendants' enforcement of Fla. Stat. § 101.67(2) is a violation of Plaintiffs' First and Fourteenth Amendment rights. · I conclude that § 101.67(2) does not amount to a violation of Plaintiffs' First and Fourteenth Amendment rights, therefore, Plaintiffs have failed to demonstrate a substantial likelihood of success under this claim.

I previously discussed the constitutional significance of the right to vote and expand upon that discussion here. Although it is beyond dispute that "voting is of the most fundamental significance under our constitutional structure ... [i]t does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (citations omitted). In fact, the Constitution itself provides that states may prescribe the "Times, Places and Manner of holding Elections" and the United States Supreme Court has recognized that

states retain the power to regulate their elections. *Id.; see also Siegel v. Lepore*, 234 F.3d 1163, 1179–80 (11th Cir.2000); Art. I, § 4, cl. 1 of the Constitution. As the United States Supreme Court noted in *Burdick*, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" 504 U.S. at 433, 112 S.Ct. at 2063 (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)).

All election laws result in the imposition of a burden on voters. *Id.* As a result, not every election law will be subjected to strict scrutiny by the courts. *Id.; see also Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983). In *Anderson v. Celebrezze*, the United States Supreme Court established that a court considering a challenge to a state election law must instead weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications forth burden imposed by its rule. In passing judgment, the Court must consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U.S. at 789, 103 S.Ct. at 1570. Hence, whether an election law is subject to strict scrutiny or some lesser standard of review depends upon the extent to which the law burdens a plaintiff's First and Fourteenth Amendment rights. *Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063. If the election law imposes a "severe" restriction on a plaintiff's First and Fourteenth

Amendment rights, the election law must be "narrowly drawn to advance a state interest of compelling importance." *Id.* (citing *Norman v. Reed,* 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)). If the election law impose "reasonable, nondiscriminatory restrictions" upon the plaintiff's First and Fourteenth Amendment rights, the "State's important regulatory interests are generally sufficient to justify" the restrictions imposed by the election law. *Id.* (*citing Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70).

■ State election laws which regulate the mechanics of voting are "reasonable, nondiscriminatory restrictions" that are generally sufficient to justify any restrictions imposed by the election laws. *See Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063; *see also McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 345, 115 S.Ct. 1511, 1518, 131 L.Ed.2d 426 (1995) (applying strict scrutiny to election law which directly regulated free speech and which did not merely control the "mechanics of the electoral process"); *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973). In *Burdick,* the plaintiff was a registered voter who challenged Hawaii's prohibition of allowing voters to vote for write-in candidates in primary or general elections. 504 U.S. at 430, 112 S.Ct. at 2061. Burdick claimed that Hawaii's ban on write-in voting violated his First Amendment right of expression and association and asked the district court to enter a preliminary injunction ordering the state to permit and count write-in votes in the general election. 504 U.S. at 430–31, 112 S.Ct. at 2061–62. The district court later granted *Burdick*'s motion for injunctive relief. 504 U.S. at 432, 112 S.Ct. at 2062.

On appeal, the Ninth Circuit Court of Appeals reversed the district court decision, finding that although Hawaii's ban on write-in voting placed some restrictions on Burdick's right to vote, the restriction was justified in light of Hawaii's broad powers to regulate elections and the specific interests advanced by the state. *Id.* Burdick appealed to the United States Supreme Court. *Id.* The United States Supreme Court agreed with the Ninth Circuit Court of Appeals. *Id.*

The United States Supreme Court recognized that Hawaii's election law did have an impact on Burdick's right to vote, however the Court found that the ban on write-in voting did not unconstitutionally limit the right of voters to have candidates of their choice placed on the ballot. *Id.* at 434, 112 S.Ct. at 2064. The *Burdick* Court explained that although Hawaii did not allow write-in votes in general elections, Hawaii had established number of routes for a candidate to have his or her name appear on the ballot for general elections until a certain deadline. *Id.* In finding that Hawaii's system provided easy access to ballots and that any burden on voters was limited to those voters who chose their candidate days before the election, the *Burdick* Court noted that it gives little weight to the interest a voter may have in "making a later rather than an early decision to seek independent ballot status." *Id.* at 437, 112 S.Ct. at 2065.

The United States Supreme Court held that to "conclude otherwise might sacrifice the political stability of the system of the State, with profound consequences for the entire citizenry, merely in the interest of particular candidates and their supporters having instantaneous access to the ballot." *Id.* In affirming the Ninth Circuit's decision vacating the injunction, the *Burdick* court concluded that "[r]easonable regulation of elections *does not* require voters to espouse positions that they do not support; it *does* require them to act in a timely fashion if they wish to express their views in the voting booth." *Id.*

Similarly, in *Rosario,* the United States Supreme Court upheld another state elec-

tion law which imposed a deadline by which voters were required to enroll in a political party in order to vote in a subsequent election. 410 U.S. 752, 754, 93 S.Ct. 1245, 1248, 36 L.Ed.2d 1. In holding that the New York election law did not constitute a ban on the voters' freedom of association under the First Amendment, the *Rosario* court emphasized that the statute did not "absolutely disenfranchise the class to which the petitioners belong ... [r]ather, the statute merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary." *Id.* at 757, 93 S.Ct. at 1249. The Court distinguished the limited restrictions on petitioners' right to vote imposed by the law from those cases where a state's election laws "totally denied the electoral franchise to a particular class or residents, and there was no way in which the members of that class could have made themselves eligible to vote." *Id.* (referring to *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (where the Texas constitution prohibited all servicemen from voting regardless of the length of residence in the state); *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (state law prohibited residents who were not parents or property owners from participating in school board elections); *Cipriano v. City of Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (state law prohibited residents who were not property owners from voting in bond elections); *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970) (state law prohibited residents of a national facility located in the state from voting in any election)). Since the voters could have enrolled in a party before the deadline in

time to vote in the next election, the *Rosario* court held that the deadline imposed by the state did not constitute a ban on the voters' First Amendment freedoms but was merely a time limitation on when the voters had to act in order for them to participate in the next election. *Id.* at 758, 93 S.Ct. at 1250.

Plaintiffs suggest that this Court should review Fla. Stat. § 101.67 under a "strict scrutiny" standard whereby Defendants [16] must show that a compelling state interest exists to justify their rejection of any domestic absentee ballots which were received after 7 p.m. on election day. Plaintiffs have not alleged that Fla. Stat. § 101.67(2) is discriminatory on its face, however. Rather, Plaintiffs allege that "Defendants' policies, practices and procedures of strictly applying the deadline set forth in Fla. Stat. § 101.67(2) to plaintiff and members of the plaintiff class deprives, and will continue to deprive, plaintiffs of the right to vote, in violation of the First and Fourteenth Amendments." (First Amended Compl.—Class Action at 8.) Plaintiffs misunderstand the standard to be applied in this case. As the United States Supreme Court held in *Burdick,* where a state election law imposes only "reasonable, nondiscriminatory" restrictions upon the right to vote, strict scrutiny is not required. 504 U.S. at 434, 112 S.Ct. at 2063. Because § 101.67(2) only relates to the mechanics of the electoral process, the correct standard to be applied in this case is whether Florida's important regulatory interests are sufficient to justify the restrictions imposed on their First and Fourteenth Amendment rights. *See id.; see also Rosario,* 410 U.S. at 752, 93 S.Ct. 1245; Green *Party v. Weiner,* 216

---

**16.** Plaintiffs' First Amended Complaint—Class Action requests only a preliminary injunction to enjoin Defendants Brenda Snipes and Constance Kaplan to count Plaintiffs' absentee ballots. **(First Amended Compl.-Class** Action at 9.) Plaintiffs no longer seek a preliminary injunction requiring Defendant Glenda Hood to order any of the other county Supervisors of Election to count any absentee ballots in this election.

F.Supp.2d 176, 187 (S.D.N.Y.2002) (finding that lesser standard of review applied to election law which mandated that primaries for certain parties would be conducted on paper ballots rather than voting machines because law only regulated the "mechanics" of the election).

Plaintiffs mischaracterize Fla. Stat. § 101.67(2). § 101.672(2) does not deny the right to vote to a class of persons. It merely imposes a deadline by which Plaintiffs must return their absentee ballots to the Supervisors of Election. § 101.67(2) proscribes the mechanics of voting by absentee voters in Florida, therefore, it is subject to a lesser standard of review under *Burdick* and *Rosario*. Defendants need only show that there are important regulatory interests which justify the limited restrictions imposed by § 101.67(2) on Plaintiffs' First and Fourteenth Amendment rights.

As the United States Supreme Court noted in *Burdick*, a state has a substantial interest in regulating their elections in order to make the elections "fair and honest" and to ensure that "some sort of order, rather than chaos, is to accompany the democratic processes." 504 U.S. at 433,

112 S.Ct. at 2063. At the hearing, a representative for Defendant Secretary of State Glenda Hood testified regarding the history and purpose of the deadlines in Fla. Stat. § 101.67(2) and Fla. Admin. Code § 1S–2.013(7). The representative testified that the 10 day extension of time for overseas absentee voters to return their ballots in § 1S–2.013 was created as a result of a consent decree entered into between the State of Florida and the United States for the purpose of allowing overseas citizens additional time to vote in elections due to the delay in delivery of overseas mail. The consent decree was the result of litigation brought by the Attorney General of the United States to compel the State of Florida to harmonize § 101.67(2) with the requirements of two federal laws—the Overseas Citizens Voting Rights Act of 1975, Pub.L. No. 94–203, 89 Stat. 1142 (codified at 42 U.S.C. § 1973ff to 1973ff–6 (1994)), and the Federal Voting Assistance Act of 1955, 42 U.S.C. § 1973cc *et seq.* (1983). *See Harris v. Florida Elections Canvassing Comm.*, 122 F.Supp.2d 1317, 1320 (N.D.Fla.2000) (discussing *United States v. Florida*, No. TCA–80–1055 (N.D.Fla.1982)—the case in which § 1S–2.013 was created).[17]

---

17. In *United States v. Florida*, No. TCA–80–1055 (N.D.Fla.1982), the United States alleged that overseas absent voters who were guaranteed the right to vote in the states where they were last domiciled under the Overseas Citizens Voting Rights Act and the Federal Voting Assistance Act, including members of the military serving abroad, were being deprived of their right to vote because it was impossible for them to mail their absentee ballots from overseas in time to meet the 7 p.m. deadline on election day. *Harris v. Florida Elections Canvassing Comm.*, 122 F.Supp.2d at 1321. As the election neared, the United States and the State of Florida reached an agreement in the case and entered into a consent decree for that election. *Id.* at 1322. The consent decree provided that overseas absent voters would receive a ten-day extension on the return of ballots deadline established in § 101.67(2) and that the Super-

visors of Election would mail the absentee ballots to those overseas absent voters 35 days prior to the election. *Id.*

The consent decree also required the State of Florida to submit a plan of compliance to the Florida Legislature which would allow American citizens living abroad a reasonable opportunity to return their ballots before the deadline for receipt of absentee ballots. *Id.* The Florida Legislature did not adopt a plan of compliance that mirrored the consent decree. *Id.* The United States complained that the State of Florida was not in compliance with the consent decree and brought the matter back before the court. *Id.* at 1323. After issuing an Order to Show Cause, the court entered an order requiring the State of Florida to submit a revised plan of compliance which satisfied the consent decree. *Id.* The second plan of compliance became a part of

■ I find that the State's interests in ensuring a fair and honest election and to count votes within a reasonable time justifies the light imposition on Plaintiffs' right to vote. Like the election laws in *Burdick* and *Rosario,* Florida's 7 p.m. deadline of returning ballots on election day does not disenfranchise a class of voters. Rather, § 101.67(2) merely imposes a time deadline by which Plaintiffs must return their votes

the Florida Administrative Code and was eventually renumbered as Fla. Admin. Code § 1S–2.013. *Id.*

In 2000, one group of Florida registered voters challenged the constitutionality of § 1S–2.103(7). In *Harris v. Florida Elections Canvassing Comm.,* the voters sued to prevent Supervisors of Elections from counting overseas absentee ballots that were received after 7 p.m. on election day. 122 F.Supp.2d at 1317. The voters claimed that § 1S–2.013(7) violated § 101.67(2) and its prohibition that no absentee ballot received after 7 p.m. on election can be counted. *Id.* at 1319. In rejecting the voters' claims, the district court noted the history of § 1S–2.013 and the fact that before § 1S–2.013 was created, all absentee ballots, whether domestic or overseas, were required to be returned to the Supervisors of Elections office no later than 7 p.m. on election day. *Id.* at 1321. The United States sued the State of Florida on the grounds that the requirement in § 101.67(2) that all overseas absentee ballots be returned by 7 p.m. on election day was a violation of overseas absentee voters' rights under the Overseas Citizens Voting Rights Act and the Federal Voting Assistance Act. *Id.* at 1323.

The district court noted that § 1S–2.013 was "the product of the state executive branch, the authorized representative of the state in a lawsuit against the state, enacting a measure to bring the state into compliance with a federally ordered mandate in a situation where the state legislature refused to do so." *Id.* In concluding that § 101.67 and § 1S–2.013 must be read together, the district court emphasized that the "administrative code provision was properly enacted by the state executive branch to allow the state to comply with federal law and thus that the Rule should not be read to be in conflict with the statute but instead to be engrafted onto it, *to allow the entire voting procedural scheme to*

to Defendants. Plaintiffs are still able to cast a ballot, however, they must either return their absentee ballots in sufficient time so that the votes are received by the 7 p.m. deadline or they must vote in person.

Plaintiffs claim that they timely requested absentee ballots in sufficient time to receive the ballots, vote the ballots and return the ballots by the November 2, 2004

*comply with federal law." Id.* at 1324 (emphasis added). The Eleventh Circuit affirmed the district court's decision. *See Harris v. Florida Elections Comm.,* 235 F.3d 578, 578 (11th Cir.2000).

Although *Harris* did not challenge the constitutionality of § 101.67(2)—it challenged the constitutionality of § 1S–2.013—the history surrounding the creation of § 1S–2.013 as a federally mandated exception to § 101.67(2) designed to render Florida's entire absentee ballot counting procedure in compliance with federal law, is illuminating. Neither the district court nor the Eleventh Circuit appeared concerned that the exception in § 1S–2.013 only for overseas absentee voters created a violation of the equal protection rights of domestic absentee voters. *Harris,* 122 F.Supp.2d at 1320; *see also Harris,* 235 F.3d at 578. Plaintiffs do not ask me to render § 1S–2.013 unconstitutional, instead they ask me to find that § 101.67(2) is unconstitutional in its application to domestic absentee voters as well. I find, however, that the justifications presented by the State of Florida (and which were accepted by the district court and the Eleventh Circuit in the *Harris* cases) for the 10 day extension of time to return ballots given to overseas absentee voters, which resulted in the very creation of the § 1S–2.013 exception, do not apply to domestic overseas voters.

I also note—but do not decide, as the issue was not raised by the parties—that the doctrine of virtual representation might be applicable to this case. *See EEOC v. Pemco Aeroplex, Inc.,* 383 F.3d 1280, 1287 (11th Cir. 2004). Plaintiffs may be barred from now challenging the unconstitutionality of Florida's election scheme if their interests "are so closely aligned" to the plaintiffs in *Harris,* if the plaintiffs in *Harris* "adequately represented" their interests. *Id.*

deadline. **(First Amended Compl. at 5.)** It should be noted that the earliest request made by any of the named Plaintiffs for an absentee ballot was Plaintiff Adam Meyer's October 20, 2004 request by mail, only twelve days before the November 2, 2004 election.[18] Although it is not critical to my analysis, under *Burdick,* of whether the State of Florida has sufficiently justified the limited restrictions imposed by the 7 p.m. deadline on Plaintiffs' right to vote, I find that Plaintiffs have failed to show that Defendants arbitrarily or deliberately delayed in sending Plaintiffs their absentee ballots.

At the time that Plaintiffs sent their late absentee ballot requests, Defendants were processing thousands of absentee ballot requests, running early voting sites and attempting to prepare for the November 2, 2004 election. I find that § 101.67(2) is a reasonable regulation and that it requires domestic absentee voters to act in a timely fashion if they wish to vote. All three named Plaintiffs *could* have requested absentee ballots before late October, just days before the election. Further, Defendants made available to Plaintiffs, like all other registered voters, the opportunity to participate in early voting or of voting in Miami–Dade County or Broward County on election day. Plaintiffs have failed to show that the slight restrictions imposed by Fla. Stat. § 101.67(2) on their First and Fourteenth Amendment rights are not sufficiently justified by the legitimate interests presented by the State of Florida.

### 3. Violation of Equal Protection Clause of the Fourteenth Amendment

Now that I have concluded that Plaintiffs do not have a substantial likelihood of success on the merits of either their claim under the Voting Rights Act claim or the First and Fourteenth Amendments, Plaintiffs must establish the likelihood of success on their Equal Protection claim in order to be entitled to a preliminary injunction. Upon reviewing the evidence presented, however, I conclude that Plaintiffs have also failed to establish sufficient evidence of a substantial likelihood that they will prevail on their claim that § 101.67(2) violates the Equal Protection Clause of the Fourteenth Amendment.

When analyzing whether a state election law violates the Equal Protection Clause of the Fourteenth Amendment, the Eleventh Circuit applies the same balancing test established in *Burdick v. Takushi.* See

---

**18.** As I explained above, Plaintiff Meyer's absentee ballot request was postmarked October 25, 2004. Although it is not clear from the evidence presented exactly when Plaintiff Meyer's absentee ballot was mailed, it was postmarked October 30, 2004, only five days after his absentee ballot request was originally postmarked. He testified that he received his absentee ballot on November 1, 2004, the day before the election. He admitted, however, that he did not check his mail until 7 p.m., at which time he concluded that it was too late for him to attempt to return the ballot for delivery by election day.

Plaintiff Fay Friedman did not request an absentee ballot until October 22, 2004. **(Declaration of Fay Friedman, DE # 1, Exhibit "A.")** An absentee ballot was mailed by Defendant Broward County Supervisor of Elections Brenda Snipes on October 25, 2004 **(Id.)** After Plaintiff Friedman failed to receive the ballot, Defendant Brenda Snipes sent another absentee ballot by Federal Express delivery on October 29, 2004. **(Id.)**

Plaintiff Daniel Benhaim requested his absentee ballot on some date in October 2004. **(Declaration of Daniel Benhaim, DE # 1, Exhibit "C.")** The absentee ballot request was incomplete and it was returned to him. **(Id.)** He testified that he believes that his mother completed the incomplete application, signed it and mailed it to Defendant Constance Kaplan during the week of October 24, 2004 by mail. He called Defendant Constance Kaplan on October 29, 2004, four days before the election to request another absentee ballot by phone. **(Id.)** When the ballot did not arrive before the election, he downloaded a federal write-in ballot and mailed it via regular mail on election day. **(Id.)**

*Fulani v. Krivanek,* 973 F.2d 1539, 1543 (11th Cir.1992); *see also Green v. Mortham,* 155 F.3d 1332, 1337 n. 10 (11th Cir. 1998). In determining whether to apply the *Burdick* balancing test to claims of alleged equal protection violations, the *Fulani* court recognized that *Burdick* involved a challenge to a state election law under the First Amendment and not the Equal Protection Clause. 973 F.2d at 1543. The *Fulani* Court noted, however, that the Eleventh Circuit considers equal protection challenges to state ballot access laws under the *Anderson* test upon which the *Burdick* balancing test was based. *Id.* (citing *Bergland v. Harris,* 767 F.2d 1551, 1552 (11th Cir.1985)). Hence, in the Eleventh Circuit, there is no doubt that equal protection challenges to a state's ballot access election law are analyzed under the *Burdick* test. *See id.; see also Green,* 155 F.3d at 1337 (holding that "we conclude that the *Anderson* balancing test still controls challenges to ballot access requirements and proceed to apply that test in the manner instructed in *Burdick.*")

■ Although I have not found, and the parties have not cited, any Eleventh Circuit case[19] which specifically addresses whether this Court must apply the *Anderson/Burdick* balancing test to voting rights challenges under the Equal Protection Clause, I conclude that voting rights challenges to a state's election laws should be analyzed under the same *Anderson/Burdick* test that applies in ballot access cases. In *Bullock v. Carter,* the United States Supreme Court made clear that voting rights cases are relatively indistinguishable from ballot access cases. 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972) (stressing that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."); *see also Bullock,* 405 U.S. at 143, 92 S.Ct. at 856 (noting that *Bullock v. Carter* "minimized the extent to which voting rights cases are distinguishable from ballot access cases"). Consequently, the *Burdick* balancing test which I applied to Plaintiffs' First and Fourteenth Amendment claims should be applied to their Equal Protection Clause claims. As I explained in Section V(A)(2) above, the State of Florida's legitimate interests in requiring domestic absentee

**19.** I did locate one Eleventh Circuit case which involved absentee ballots and claims of alleged equal protection violations. *See Roe v. Alabama,* 68 F.3d 404, 404 (11th Cir.1995). In *Roe,* Plaintiffs were a class of voters who claimed that the Alabama Secretary of State and the county Supervisors of Elections in Alabama deprived the voters of equal protection of the laws by refusing to count Plaintiffs' absentee ballots on the grounds that the ballots failed to comply with the requirements of Alabama Code § 17–10–7. *Id.* at 405. Section 17–10–7 required that all absentee ballots must be enclosed in an envelope which bore the signature of a notary public or two witnesses or the ballots would be invalid. *Id.* The plaintiffs argued that the defendants would deprive them of their rights under the equal protection clause if Supervisors of Elections counted contested ballots in some counties but not others. *Id.* at 406. At trial, the district court found that the practice in Alabama had been to uniformly exclude any ballots which did not comply with the literal requirements of § 17–10–7. *Id.*

On appeal, the Eleventh Circuit held that refusing to count the plaintiffs' ballots did not deprive them of the equal protection of the laws. *Id.* at 408. The *Roe* Court noted that because only one Alabama county counted ballots which did not conform to the express requirements of § 17–10–7, "we fail to see how the State's refusal to count the contested ballots could deny the [plaintiffs] due process of law ... [or] equal protection of the law." *Id.* Similarly, in this case, no Florida counties count any domestic absentee which fail to conform to the express requirements of § 101.67(2). Consequently, Miami–Dade county and Broward county's refusal to count Plaintiffs' non-conforming ballots is not a denial of the equal protection of the law.

voters to return their ballots by 7 p.m. on election day justify the slight restrictions imposed on the rights of domestic absentee voters to vote, hence Plaintiffs have failed to establish that § 101.67(2) unconstitutionally denies Plaintiffs the equal protection of the laws.

Moreover, as Defendants argue in their Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, the very relief requested by Plaintiffs, if granted, would amount to a denial of the equal protection rights of all domestic absentee voters who live outside of Broward and Miami–Dade counties (see Defendant Glenda Hood's Memorandum in Opposition at 3). In Bush v. Gore, the United States Supreme Court addressed the issue of whether manual recounts of votes cast in the 2000 election in only some Florida counties and not in others violated the Equal Protection Clause of the Fourteenth Amendment. 531 U.S. 98, 103, 121 S.Ct. 525, 529, 148 L.Ed.2d 388 (2000). The dispute arose after the Florida Division of Elections reported that the Republican candidate for President, Governor George W. Bush had a margin of victory over the Democratic candidate for President, Vice President Albert Gore, Jr., of only 1,784 votes. 531 U.S. at 101, 121 S.Ct. at 528. As the margin of victory was less than one half of one percent of the votes cast in the election, Florida law required an automatic machine recount of all votes cast. Id. The results of the automatic machine recount showed that Governor Bush had still won the election but by an even smaller margin. Id.

Vice President Gore then sought manual recounts in four Florida counties under Florida election law contest provisions. Id. A state trial court denied Vice President Gore's petition for an election contest on the grounds that he had failed to establish the requisite burden of proof to show that there was a rejection of a number of "legal votes" sufficient to change or place in doubt the outcome of the election. Id. On appeal, the Florida Supreme Court affirmed in part and reversed in part finding that Vice President Gore had satisfied the burden of proof with respect to the results of one of the counties he sought to challenge: Miami–Dade County. Id. at 102, 121 S.Ct. at 528. The Florida Supreme Court ordered a manual recount of 9,000 ballots in Miami–Dade County which had failed to register a vote for President in the election. Id. The Florida Supreme Court also ordered the circuit court to include additional votes for Vice President which had been identified in a manual recount in Palm Beach County in the state elections totals. Id. at 103, 121 S.Ct. at 529.

The plaintiffs, Governor George W. Bush and Vice Presidential candidate Richard Cheney filed suit in the United States Supreme Court seeking a stay of a decision of the Florida Supreme Court. Id. at 100, 121 S.Ct. at 527. Plaintiffs argued that the manual recount violated the Constitution on a number of grounds, including the Equal Protection Clause. Id. at 103, 121 S.Ct. at 529. The United States Supreme Court agreed with Plaintiffs and held that allowing the manual recount violated the Constitution. Id. at 110, 121 S.Ct at 533. The Court explained that the "right to vote is protected in more than the initial application of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Id. at 105, 121 S.Ct. at 530.

In analyzing the standards used by those Florida counties which conducted the manual recounts, the Court noted that the "recount mechanisms implemented in re-

sponse to the decisions of the Florida Supreme Court do not satisfy the minimum requirement for nonarbitrary treatment of voters necessary to secure the fundamental right." *Id.* at 105, 121 S.Ct. at 530. The Court declared that the manual recounts amounted to a denial of equal protection because the "unequal evaluation of ballots" has led to "standards for accepting or rejecting contested ballots [that] might vary not only from county to county but indeed within a county from one recount team to another." *Id.* at 106, 121 S.Ct. at 530–31. In rejecting the limited manual recounts, the Court cited *Gray v. Sanders,* a 1963 United States Supreme Court case where the Court found a constitutional violation of the "one-person, one vote jurisprudence when a State accorded arbitrary and disparate treatment to voters in its different counties." *Id.* at 107, 121 S.Ct. at 531 (citing *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963)). The Court also cited another United States Supreme Court case, *Moore v. Ogilvie* for the same one-person, one-vote principle, wherein the Court observed that the "idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Id.* (citing 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969)). Consequently, the Court reversed the Florida Supreme Court decision ordering the limited recounts. *Id.* at 110, 121 S.Ct. at 533.

Plaintiffs' requested relief would result in the very granting of greater voting strength to one group over another which the United States Supreme Court found violated the one man, one vote principle which is the basis of our representative government. As I explained above, Plaintiffs have now withdrawn their demand for preliminary injunctive relief that Defendant Secretary of State Glenda Hood take actions to force all of the other 65 Florida county Supervisors of Election to count

domestic absentee ballots received after 7 p.m. on November 2, 2004. Plaintiffs now ask this Court to grant preliminary injunctive relief only against Defendants Brenda Snipes and Constance Kaplan and to order only the counting of those domestic absentee ballots which are postmarked by 7 p.m. on November 2, 2004 and which are received by November 12, 2004 in Broward and Miami–Dade counties. Plaintiffs' decision to drop the Supervisor of Elections from this request for injunctive relief now ensures that, if Plaintiffs were to succeed on their claims, the late received ballots of domestic absentee voters in every other Florida county will not be included in the election totals. This in itself would result in a denial of the equal protection of the laws to all domestic absentee voters outside of Broward and Miami–Dade counties.

Plaintiffs now advocate a standard for accepting or rejecting contested ballots that varies from county to county and ask this Court to fashion a ruling which results in "arbitrary and disparate treatment" of voters in Florida's different counties. Plaintiffs' failure to join the 65 other county Supervisors of Elections as party-Defendants amounts to a failure to join indispensable parties under Federal Rule of Civil Procedure 19. *See, e.g., Focus on the Family v. Pinellas Suncoast Trans. Auth.,* 344 F.3d 1263, 1280 (11th Cir.2003). This omission ensures that any Order issued by this Court would have unequal application across Florida and would "leave ... the persons already parties subject to a substantial risk of incurring ... inconsistent obligations;" this is exactly why Rule 19(a) requires the joining of indispensable parties. Plaintiffs' dismissal of Defendant Glenda Hood has undermined their own efforts to prove their equal protection claim. By dismissing Defendant Glenda Hood from this action, granting Plaintiffs' requested relief would ensure the unequal application of the law to domestic absentee voters throughout the state—precisely the

unequal treatment against which the Constitution was designed to protect.

## VI. Conclusion

The Eleventh Circuit has warned that "[p]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution". *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir.1994) (citing *Northeastern Fla. Chapter of Ass'n of Gen. Contractors of America v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990)). Plaintiffs seek a preliminary injunction to force Defendants Brenda Snipes and Constance Kaplan to disregard the requirements of Fla. Stat. § 101.67(2) and instead to apply the 10 day extension for the receipt of overseas absentee ballots in § 1S–2.013(7) to all domestic absentee ballots postmarked by 7 p.m. on election day. As Plaintiffs have not made a clear showing that a preliminary injunction before trial is demanded by the Constitution, I deny the Plaintiffs' request for a preliminary injunction.

Further, as I explained above, Plaintiffs have failed to name indispensable parties in this action, specifically the other 65 Florida county Supervisors of Elections. The presence of these parties is essential to ensuring that any injunctive relief ordered would ensure the equal application of law throughout the State of Florida. Accordingly, it is hereby **ORDERED AND ADJUDGED:**

1. Plaintiffs' request for a preliminary injunction in their Emergency Motion for a Temporary Restraining Order and/or Preliminary Injunction and Request for an Emergency Hearing **[DE # 2]** is DENIED.

2. The temporary restraining order I ordered in my Order Granting Temporary Restraining Order **[DE # 15]** is CANCELED.