# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

APRIL 5, 2007

**Before**

Hon. Frank H. Easterbrook, *Chief Judge*

Hon. Richard A. Posner, *Circuit Judge*

Hon. Joel M. Flaum, *Circuit Judge*

Hon. Kenneth F. Ripple, *Circuit Judge*

Hon. Daniel A. Manion, *Circuit Judge*

Hon. Michael S. Kanne, *Circuit Judge*

Hon. Ilana Diamond Rovner, *Circuit Judge*

Hon. Diane P. Wood, *Circuit Judge*

Hon. Terence T. Evans, *Circuit Judge*

Hon. Ann Claire Williams, *Circuit Judge*

Hon. Diane S. Sykes, *Circuit Judge*

Nos. 06-2218, 06-2317

WILLIAM CRAWFORD, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MARION COUNTY ELECTION BOARD, *et al.*,

*Defendants-Appellees*.

_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:05-cv-00634-SEB-VES—**Sarah Evans Barker**, *Judge*.

_____

**ORDER**

On January 17, 2007, plaintiffs-appellants filed a petition for rehearing with suggestion for rehearing *en banc*, and on February 6, 2007, defendants-appellees filed an answer to the petition. A vote of the active members of the court on whether to grant rehearing en banc was requested and a majority of the judges have voted to deny the petition.[Œ] Judge Wood's opinion dissenting from the denial of rehearing *en banc* is appended.

The petition is therefore DENIED.

WOOD, *Circuit Judge*, with whom Judges ROVNER, EVANS, and WILLIAMS join, dissenting from the denial of rehearing *en banc*. The panel's opinion in this case addresses an exceptionally important unresolved question of law: what level of scrutiny should courts use when evaluating mandatory voter identification laws? I agree with the concerns expressed by Judge Evans, writing in dissent from the panel's opinion. Although the panel majority correctly notes that the Supreme Court's decision in *Burdick v. Takushi*, 504 U.S. 428 (1992), recognizes that strict scrutiny is not required for the assessment of every last election regulation, no matter how trivial the rule or how light the burden on voting, the panel assumes that *Burdick* also means that strict scrutiny is no longer appropriate in *any* election case. As Judge Evans makes clear, however, *Burdick*

---

[Œ] Judge Rovner, Judge Wood, Judge Evans and Judge Williams voted to grant the petition for rehearing *en banc*.

holds no such thing. To the contrary, *Burdick* simply established a threshold inquiry that a court must perform before it decides what level of scrutiny is required for the particular case before it. As I explain briefly below, when there is a serious risk that an election law has been passed with the intent of imposing an additional significant burden on the right to vote of a specific group of voters, the court must apply strict scrutiny. Only this exacting approach will suffice to ensure that state law is not being used to deny these citizens their fundamental right to vote.

The *Burdick* Court held that "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." 504 U.S. at 434. If those rights are subjected to "severe" restrictions, the Court reaffirmed that "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' "*Id.*, quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992). If, on the other hand, the state law provision "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." 504 U.S. at 434, quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). To sort election laws into one category or the other, *Burdick* calls for the court to "weigh the character and magnitude of the asserted injury" that the plaintiff is asserting "against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." 504 U.S. at 434 (internal quotation marks and citations omitted).

In this case, the plaintiffs assert that the state voter identification law is causing the wholesale disenfranchise-

ment of some eligible voters. To the extent that it operates to turn them away from the polls, it is just as insidious as the poll taxes and literacy tests that were repudiated long ago. Anecdotal evidence suggests that the kind of close look that would take place if we used strict scrutiny would reveal troublesome patterns resulting from these new identification laws. The New York Times recently reported that overall voter turnout in these states decreases by about three percent, and by two to three times that much for minorities. Christopher Drew, *Low Voter Turnout is Seen in States That Require ID*, NY TIMES, Feb. 21, 2007. In this case, the majority concedes that poorer voters are less likely to have the necessary identification than their wealthier counterparts and that there is a strong correlation between income and voting for particular political parties. My colleagues dismiss these facts by concluding that "[t]he fewer people harmed by a law, the less total harm there is to balance against [state interests]." Recent national election history tells us, to the contrary, that disenfranchising even a tiny percentage of voters can be enough to swing election outcomes. Christine Gregoire captured the gubernatorial race in Washington State in 2004 with a margin of only 129 votes. See http://en.wikipedia.org/wiki/Washington_gubernatorial_election,_2004 (visited March 22, 2007). Representative Vern Buchanan of Florida's 13th Congressional District won by only 329 votes. See http://en.wikipedia.org/wiki/Florida%27s_13th_congressional_district (visited March 22, 2007). Senator Jon Tester of Montana won his seat by a slightly larger margin—2,847 votes—but hardly a gap that implies that small numbers do not matter. See http://en.wikipedia.org/wiki/Jon_Tester (visited March 22, 2007). And surely no adult now living in the United States needs to be reminded of how close the 2000 Presidential race was.

Putting aside these examples, as a matter of law the Supreme Court's voting cases do not support a rule that depends in part for support on the idea that no one vote matters. Voting is a complex act that both helps to decide elections and involves individual citizens in the group act of self-governance. Even if only a single citizen is deprived completely of her right to vote—perhaps by a law preventing anyone named Natalia Burzynski from voting without showing 10 pieces of photo identification—this is still a "severe" injury for that particular individual. On the other hand, some laws that place a minor obstacle to voting in the way of many citizens—perhaps one that prevents any person from voting who is not registered to vote 28 days in advance of the election—are rightly seen as "reasonable [and] nondiscriminatory."

The state's justification for the new voting requirement is voter fraud—specifically, the problem of fraud on the part of people who show up in person at the polling place. Yet the record shows that the existence of this problem is a disputed question of fact. It is also a crucial question for the inquiry that *Burdick* demands, because if the burden on voting is great and the benefit for the asserted state interest is small as an empirical matter, the law cannot stand. This creates, as FED. R. CIV. P. 56 puts it, a "genuine issue of material fact" that may not be resolved in favor of the state in ruling on the state's own motion for summary judgment. In fact, it appears that no one has ever, in Indiana's history, been charged with voter fraud. *Burdick* requires an inquiry into the "precise interests put forward by the State as justifications for the burden imposed," but in this case, the "facts" asserted by the state in support of its voter fraud justification were taken as true without any examination to see if they reflected reality.

Finally, this court should not ignore this country's history. Unfortunately, voting regulations have been used in the not-so-distant past for discriminatory reasons. The law challenged in this case will harm an identifiable and often-marginalized group of voters to some undetermined degree. This court should take significant care, including satisfactorily considering the motives behind such a law, before discounting such an injury.

It may be that even under the exacting scrutiny *Burdick* mandates for laws that impose severe restrictions, under which we must decide whether the regulation is narrowly drawn to advance a state interest of compelling importance, the Indiana law challenged here would stand. We are not yet in a position to conduct that inquiry. Before undertaking that task, the full court should decide what standard should govern review of such a law and what kind of empirical record must be assembled to support whatever standard it chooses. For all of these reasons, I respectfully dissent from the decision not to rehear this case *en banc*.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*
