BARKETT, Circuit Judge,
concurring in part, dissenting in part:
I agree with the majority that Plaintiffs have standing in this case. However, I dissent from the majority’s determination that Plaintiffs are not entitled to a preliminary injunction against the enforcement of Florida Statutes § 97.053(6)(“Subsection 6”), which impermissibly disenfranchises Florida citizens.
In 2006, Florida added a provision to its voter registration process, Subsection 6,[1] *1176 that requires “matching” a voter’s driver’s license or social security number on his or her application to an official database.[2] Florida and the majority read this provision to say that the match from the official database must be, not to the actual and valid driver’s license or social security card, but to the name and number placed on the registration application. Under the majority’s interpretation of this provision, regardless of an applicant’s proof of eligibility, any provisional vote legitimately cast in an election will not be counted if an applicant’s name or number is erroneously copied onto the application form. An individual’s ability to cast a provisional ballot therefore turns not on whether he or she is eligible to vote, but on whether the name or number on the registration application contains a mistake.
Such a requirement for voting violates the Help America Vote Act of 2002 (“HAVA”), the Voting Rights Act, and the First and Fourteenth Amendments of the Constitution. Moreover, I cannot believe that this interpretation was intended by the Florida legislature. It is inconceivable that a state would intend that a typographical or transpositional error on a registration application could not be corrected through irrefutable proof of a valid driver’s license or social security card to permit a Florida citizen’s vote to be counted. The right to vote is a “fundamental matter in a free and democratic society.” Reynolds v. Sims, 377 U.S. 533, 561-62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and pursuant to Subsection 6, Florida has impermissibly deprived a class of over 14,000 citizens[3]— the vast majority of whom are minorities[4] —that fundamental right.
I. Florida’s “Matching” Requirement[5]
For a voter registration application to be “complete,”[6] an applicant must not only *1177 satisfy the qualifications to register to vote,[7] but the state must also match “[t]he applicant’s ... driver’s license number” or “the last four digits of the applicant’s social security number”[8] to the database of either the Florida Department of Highway Safety and Motor Vehicles (“DHSMV”) or the Social Security Administration (“SSA”). Fla. Stat. § 97.053(5)(a)-(b), (6). An “incomplete” application because of non-matching will be rejected and the applicant’s name will not be placed on the voter rolls prepared for election day. However, such an applicant could vote provisionally, the validity of that vote being subject to the applicant correctly “completing” her application within two days following an election.[9]
The state and the majority take the position that such a provisional ballot may be counted only if the state made the mistake in the matching process but not if that very same mistake was made by the applicant. If an election official transposes two numbers or omits a letter, hyphen, or suffix from a name on a registration application when entering that information into the state’s voter database, resulting in a non-match with either the DHSMV or SSA database, that applicant’s provisional ballot will be counted upon presentation of a valid driver’s license or social security card. Id. § 97.053(6). However, if the applicant makes the very same mistake on her application, then no matter what irrefutable proof she provides of her identity and eligibility to vote, including a valid driver’s license or social security card, her provisional ballot will never be counted.
This inconsistency in the treatment of provisional ballots is compounded by the fact that there is no provision under Florida law that addresses disputes regarding whether the mistake was made by the applicant or by an election official. For example, an applicant may well argue that *1178 her application is correct, but that an election official misread the application by seeing a “7” where the applicant wrote the number “1,” or by construing the number “5” as the letter “S.”[10]
For the reasons more fully explained below, permitting Florida to disenfranchise voters under this scheme violates both federal law and the Constitution.
II. Subsection 6 Conflicts With HAVA.
As a result of the voting difficulties experienced during the 2000 presidential election, Congress passed HAVA in order to make sweeping reforms to our nation’s voting processes, including states’ registration processes. See 42 U.S.C. § 15301 et seq. Any method used by a state in conducting voter registration must now take into account HAVA’s goals in promoting methods of voting and administering elections which are “the most convenient, accessible, and easy to use for voters” and which are “nondiscriminatory and afford each registered and eligible voter an equal opportunity to vote and have that vote counted.” Id. § 15381(a)(1) & (3), (b)(3) (emphasis added).
Among the methods utilized to promote these goals, Section 302 of HAVA provides for the casting of provisional ballots. See id. § 15482. Under Section 303(b)(2)(B) (the “fail-safe voting” provision), an individual who does not meet the identification requirements for voting in-person or by mail under Section 303(b)(2)(A) may cast a provisional ballot in accordance with Section 302(a). Id. § 15483(b)(2)(A)-(B). If an individual does not appear on a registration list or an election official determines that she is not eligible to vote, Section 302(a) provides that an individual “shall be permitted to cast a provisional ballot” if she affirms to an election official that she is a registered and eligible voter. Id. § 15482(a)(2)(A)-(B). This must simply mean that the voter believes herself to have adequately registered. Thereafter, an election official must determine only that the individual is “eligible under State law” to vote, in which case her provisional ballot will be counted. Id. § 15482(a)(4).[11] The intent behind this section was to permit voters to prove within a reasonable time after an election that they are, in fact, eligible voters and the state’s initial view to the contrary was erroneous.
However, Subsection 6 completely eviscerates provisional balloting for a group of otherwise eligible voters who make a mi *1179 nor mistake on their registration applications.[12] Subsection 6 permits voters to cast a provisional ballot which will be counted only if applicants present evidence — their driver’s license or social security card — which verifies the number “provided on [their] application,” Fla. Stat. § 97.053(6) (emphasis added). This is impossible if an applicant has made a minor mistake in writing her name or number on her application. An actual, valid driver’s license or social security number will never match the registration application upon which two numbers might have been transposed, or upon which a letter or hyphen might have been inadvertently omitted from a name. According to the state, it is the match itself, not the validity of the requested information, that is determinative of a vote being counted. Thus, when an applicant makes a minor mistake on her registration application, the majority says that Florida is free to disregard HAVA’s provisions for provisional balloting. This view nullifies provisional balloting for those voters who are clearly eligible but for a minor error on their applications.
As the majority notes, “[t]he question remains whether Subsection 6 sufficiently impedes HAVA’s objectives as to be preempted by it.” (Maj. Op. at 1171-72.) For any court, “[the] ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole.” Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992). If a challenged state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,” then it is preempted by federal law. Hines v. Davidowitz, 312 U.S. 52, 66-67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Pharm. Research & Mfrs. of America v. Meadows, 304 F.3d 1197, 1205 (11th Cir.2002).[13] In determining what is a “sufficient obstacle,” we look to the federal statute as a whole and identify its purpose and intended effects. Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000).[14]
The majority reads HAVA as authorizing the administrative matching of numbers and letters as a precondition to regis *1180 tration. This misreading clearly conflicts with HAYA’s objectives of promoting accessible and non-discriminatory methods of voting that minimize voter disenfranchisement. These objectives preclude states from using the identification-verification process as a basis for excluding actually qualified voters. While I certainly agree that states have the right to “determine whether the information provided by an individual is sufficient to meet the requirements [for voter registration under HAVA], in accordance with State law,” see 42 U.S.C. § 15483(a)(5)(A)(iii), they cannot do so in a way that would prevent a clearly and undisputedly eligible voter from having her vote counted.
Although the majority states that we should look at HAVA through a “wider lens” so that we do not overlook Congress’ intent in enacting HAVA at the expense of “HAVA’s clumsy subsections and clauses” (Maj. Op. at 1171), the majority fails to do what it says: to specifically look at Subsection 6 in light of HAVA’s purposes. Instead, the majority begs the question by holding that Subsection 6 is permissible because Congress did not intend to prescribe uniform national standards for both voter registration and identification. (See id. at 1172-73.)
The majority reasons that because Congress did not impose uniform national standards for voter registration when it enacted HAVA, the implication is that Congress left room for states to “supplement” HAVA’s provisions with laws such as Subsection 6. (See id. at 1167-68 (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)); see also id. at 1172-73.) But HAVA does not need to prescribe uniform national standards for voter registration in order for HAVA to preempt Subsection 6.[15] Although not preempting all state registration and identification laws, under the doctrine of conflict preemption, HAVA will preempt those state laws that act as “obstacle[s] to the accomplishment and execution of the fall purposes and objectives of Congress.” Hines, 312 U.S. at 66-67, 61 S.Ct. 399 (emphasis added). The Supreme Court was explicit when it stated that if there is “any conflict” with a federal statute, the state law in question is preempted. Crosby, 530 U.S. at 372, 120 S.Ct. 2288 (emphasis added) (citing California v. ARC Am. Corp., 490 U.S. 93, 101, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)). Subsection 6 is such a law, and thus, preempted by HAVA.
Furthermore, as explained later herein, by interpreting HAVA as allowing Florida to make administrative matching and verification a precondition of eligibility, Subsection 6 fails to pass constitutional muster. Given the choice between two interpretations of a federal statute, we should choose the one that does not deprive citizens of their fundamental constitutional rights. If we are to seriously strive in upholding the integrity of elections, citizens must be given at a bare minimum a fair opportunity to vote. The state’s concern with fraud is not a one-way street: not only must the government make sure that individuals are not voting fraudulently, but the government must not fraudulently deprive its citizens of their lawful right to vote. With no evidence of voter fraud in Florida, and with the undisputed fact that over 14,000 individuals to date have been denied their *1181 right to vote simply because their applications have not been administratively matched, even though they may be able to prove their eligibility to vote, Subsection 6 conflicts with HAVA and is preempted by it.
III. Subsection 6 Violates the Voting Rights Act.
Florida’s matching scheme also violates the Voting Rights Act (“VRA”). The VRA, “and its grant of authority to the federal courts to uncover official efforts to abridge minorities’ right to vote, has been of vital importance in eradicating invidious discrimination from the electoral process.” Miller v. Johnson, 515 U.S. 900, 927, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Specifically, the VRA provides that no person shall be denied the right to vote “because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.” 42 U.S.C. § 1971(a)(2)(B).[16]
This provision — known as the “materiality provision” — was created “to eliminate practices that could encumber an individual’s ability to register to vote.” Friedman v. Snipes, 345 F.Supp.2d 1356, 1371 (S.D.Fla.2004); see also McKay v. Altobello, No. 96-3458, 1996 WL 635987, at *2, 1996 U.S. Dist. LEXIS 16651, at *3 (E.D.La. Oct. 31, 1996) (The materiality provision “is an anti-discrimination statute designed to eliminate the discriminatory practices of registrars through arbitrary enforcement of registration requirements. It addresses errors and accidental omissions in registration, not the intentional refusal to provide required information.”); Condon v. Reno, 913 F.Supp. 946, 949 (D.S.C.1995) (noting that Congress enacted the VRA to “deal with the problem of registering as a deterrent to voting”).
Although the majority acknowledges that Congress enacted the VRA as a means of combating “burdensome [state] registration requirements to disenfranchise African-Americans,” its test of “materiality” pays only lip-service to, and would frustrate, that very purpose. (Maj. Op. at 1172-73.)
To determine whether an error is material, the majority’s test ignores the nature of the error and asks solely whether the underlying information containing the error is relevant in determining an applicant’s eligibility to vote. I agree that this is a necessary first step. If the information is not material in determining the eligibility of the applicant, it follows that any error or omission in reporting that information necessarily would not be material and there would be no need for further analysis. See, e.g., Schwier v. Cox, 439 F.3d 1285, 1286 (11th Cir.2006). But Congress recognized in passing the VRA that discriminatory registration requirements are more sophisticated and pernicious than simply asking applicants for immaterial information. Its concern was not merely with overtly discriminatory requirements that ask for irrelevant information, but also with requirements that ask for relevant information but disproportionately penalize applicants for trivial mistakes.
For example, the court in Condon recognized that Congress intended the VRA to eliminate the practice of disqualifying applicants who make mistakes when asked to “list the exact number of months and days *1182 in [their] age.” 913 F.Supp. at 950. The majority recognizes that Congress sought to end such insidious practices, (see Maj. Op. at 1172-73), but under its test for materiality, it would have to find the practice discussed in Condon permissible because the underlying substantive information sought — the age of the applicant — is material in determining whether the applicant is eligible. As this application of the majority’s test makes clear, it is insufficient to look solely at the “nature of the underlying information requested,” (id. at 1174-75), to determine the materiality of an error or omission.
Therefore, even taking as true the majority’s contention that an applicant’s driver’s license or social security number is per se material because of HAVA, (which I do not),[17] that fact alone does not end the materiality inquiry in assessing errors under Florida’s matching scheme. The nature of the error must also be considered. Under Florida’s scheme, an applicant with a hyphenated last name would have her application denied if the databases did not include the hyphen; similarly, an applicant who failed to include a suffix such as “Jr.” or “Sr.” would have his application denied. Even though the information sought is clearly relevant, these small inconsistencies would not preclude a reasonable election official from identifying the applicant and, thus, should not be considered either a material error or omission.[18] Similarly, the accidental transposition of two numbers from a driver’s license or social security number is not a material error under the VRA.[19] These are the very mistakes that Congress intended to prevent states *1183 from using as “burdensome” barriers to registration.
Furthermore, the state’s own practices confirm that a minor error on an application, in and of itself, is not immutably material. At oral argument, the state admitted that when it makes similar mistakes, applicants are allowed to cure those mistakes after casting a provisional ballot. Thus, if an applicant is able to correct an error made by the state, a similar error made by a voter without a meaningful opportunity to cure that error cannot be material in determining eligibility.
The VRA simply does not countenance the inhumanly strict precision demanded by Florida’s matching scheme.
IV. Subsection 6 Violates the U.S. Constitution.
Although I recognize that the constitutional questions were not decided below, it is necessary to address them here because the majority’s reading of HAVA and the VRA leaves Florida citizens without any statutory basis upon which to contest the lawfulness of Subsection 6. While it is a “principle of judicial restraint” that courts should “avoid reaching constitutional questions in advance of the necessity of deciding them,” Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988), this principle does not dictate that constitutional questions be avoided at all costs, but rather that a court address statutory questions before constitutional ones. United States v. Odom, 252 F.3d 1289, 1293 (11th Cir.2001). The district court did so, resolving the issue without implicating any constitutional concerns.[20] However, Florida’s matching scheme, as enacted and implemented by the state and validated by the majority, violates both the Due Process and Equal Protection Clauses of the Fourteenth Amendment and places an undue burden on the right to vote in violation of the First and Fourteenth Amendments.[21]
A. Subsection 6 Violates the Due Process Clause of the Fourteenth Amendment.
When an election process “reache[s] the point of patent and fundamental unfairness,” there is a due process violation. Roe v. Alabama, 43 F.3d 574, 580 (11th Cir.1995) (citing Curry v. Baker, 802 F.2d *1184 1302, 1315 (11th Cir.1986)). While there is no bright line in determining when an election process has reached the level of “patent and fundamental unfairness,” this is not an “ordinary dispute over the counting and marking of ballots” or a simple “deviation from absolute accuracy.” See Curry, 802 F.2d at 1316. Rather, we are faced with a registration system plagued by the inadequacy of notices sent to unmatched registrants, the lack of adequate process to correct minor mistakes, and the outright refusal to count provisional ballots because of minor mistakes. All of these critical problems with Florida’s registration system render the election process under Subsection 6 patently and fundamentally unfair.
Under Florida’s matching scheme, Florida’s sixty-seven counties are free to provide, and actually do provide, notices different in content and form to applicants whose registration applications have been rejected. These notices to unmatched applicants are wholly inadequate to ensure that voters are given a fair opportunity to not only cast a ballot, but to have their ballot counted. As the majority concedes, the notices sent to unmatched applicants are “generic,” simply advising an applicant that she is not registered because her application was “incomplete” or “incorrect.”
The “generic” notices do not tell applicants what is required to cure an erroneous application. There is no explanation that the rejection was due, for example, to an unmatched driver’s license or social security number. Nor is there any notice at all that if an application containing an error made by the applicant is not corrected before the book-closing date, the provisional ballot cast by the applicant pursuant to HAVA and Subsection 6 will not be counted.
Moreover, the “generic” notices may not, and often do not, reach applicants in the mail until it is too late to rectify any mistakes on their applications before the book-closing deadline. Even if an applicant timely presents herself at an election office with a passport or birth certificate in response to the notice that her application is “incomplete,” her effort will have been to no avail. If she does not have her driver’s license or social security card with her to match the name or number on her application, her application will remain “incomplete” and she will not be registered.[22] Having to go to an election office is burdensome enough for most individuals who may not have the means to get to an election office or cannot take the time from work to do so; an additional trip with the necessary documentation is even more so.[23]
*1185 Even the state’s “Voter Registration” website, which is misleading, does not provide adequate notice. The website does not provide voters with any notice regarding Florida’s matching scheme.[24] It does not once make mention of a matching program, nor does it state that if a voter registration application is “incomplete,” a notice will be mailed to the applicant.[25] Furthermore, the website states that “[i]n order to register,” an applicant must provide her driver’s license number or the last four digits of her social security number, which will “be used only for voter registration purposes,” and not as a determinant of an applicant's eligibility.[26] A state registration system, the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter’s eligibility and that fails to give voters a fair opportunity to cure minor mistakes, is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment.
B. Subsection 6 Violates the Equal Protection Clause of the Fourteenth Amendment.
Subsection 6 also violates the Equal Protection Clause of the Fourteenth Amendment. When a state adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment guarantees qualified voters a substantive right to participate equally with other qualified voters in the electoral process. Reynolds v. Sims, 377 U.S. 533, 566, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); see also Harper v. Va. Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). In any state-adopted electoral scheme, “[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person’s vote over that of another.” Bush v. Gore, 531 U.S. 98, 104-05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000); see also Davis v. Bandemer, 478 U.S. 109, 124, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (noting that “everyone [has] the right to vote and to have his vote counted”).
Having granted its citizens the right to vote, Florida must not only allow qualified voters to participate equally in elections, it must also ensure that qualified voters are given an equal opportunity to participate in elections. Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 81, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978) (Brennan, J., dissenting) (quoting Hadley v. Junior Coll. Dist., 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970)). Despite this constitutional mandate, Florida’s matching scheme results in the arbitrary and disparate treatment of *1186 its citizens based on their county of residence.
It is well-established that when a state accords arbitrary and disparate treatment to voters in different counties, which results in their votes being weighed differently, those voters are deprived of their constitutional rights to due process and equal protection. Bush, 531 U.S. at 107, 121 S.Ct. 525 (citing Gray v. Sanders, 372 U.S. 368, 379-80, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963); Moore v. Ogilvie, 394 U.S. 814, 819, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969)). Florida’s registration scheme is “not a process with sufficient guarantees of equal treatment” because it is completely devoid of specific standards to ensure that the right to vote is available equally to all potential voters. See id. at 105-07, 121 S.Ct. 525 (finding that Florida’s recount mechanisms to discern the “intent of the voter” were arbitrary as the state lacked specific standards to ensure their equal application). From the lack of a procedure to discern whether the state or the applicant herself committed a matching error, to the differing notices and processes to correct unmatched applications, Florida’s matching scheme is subject to disparate implementation among Florida’s sixty-seven counties. Even if Subsection 6 mandated uniform notice and methods for determining to whom a mistake is attributable, Florida’s matching scheme would still result in uneven treatment of voters within counties.
Without the requisite post-“non-match” safeguards in place to ensure the non-arbitrary treatment of its voters, Florida’s matching scheme stands as an unneees-sary, additional barrier to registration, resulting in systemic errors as to applicants’ eligibility and thereby creating unequal opportunities for Florida citizens to vote. Indeed, this conclusion is reinforced by the fact that this error-prone system has resulted in a strong statistical likelihood that the registration process will be substantially more difficult for a minority voter than for a non-minority voter.[27] Subsection 6’s disproportionate impact on minorities cannot be disregarded in assessing the scheme’s constitutionality.
C. Subsection 6 Places an Undue Burden on the Right to Vote.
Florida’s matching scheme likewise fails under the First and Fourteenth Amendments because it imposes a severe restriction on the right to vote that is not justified by a compelling state interest. See Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). An individual’s fundamental right to vote must be weighed against the state’s power to regulate elections. See U.S. Const, art. I, § 4, cl. 1; see also Tashjian v. Republican Party, 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). We must assure that in balancing the two, we take into account both “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments” and “the precise interests put forward by the State as justifications for the burden imposed by its rule.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (quoting Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983)).[28]
*1187 When an individual's First and Fourteenth Amendment rights are subject to “severe” restrictions, the state election law must be “narrowly drawn to advance a state interest of compelling importance.” Id. at 434, 112 S.Ct. 2059; Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); see also Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 216, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (O’Connor, J., concurring in part, dissenting in part). In this case, we do not have a state electoral scheme that teeters on the cusp of reasonableness. Florida’s matching scheme clearly imposes a “severe” restriction on 14,000 individuals and counting as it requires the matching of an identifying number as a prerequisite to voter eligibility. See Common Cause/Georgia v. Billups, 439 F.Supp.2d 1294, 1350 (N.D.Ga.2006) (noting that the deprivation of the right to vote is “undeniably demoralizing and extreme”).[29]
Subsection 6 severely restricts the right to vote by adding a layer of complexity and precision to voter registration that is unduly burdensome. All unmatched voters are subjected to additional bureaucratic, administrative, and technological barriers to voting. Prior to the book-closing deadline, in order to cast a regular ballot on election day, unmatched voters must take steps to provide to the appropriate election official the necessary documentation to verify their application information. This entails traveling to an election office and navigating through a complex bureaucracy without clear guidance.
For those who remain unmatched past the book-closing deadline, Subsection 6 places even more onerous burdens on the right to vote. For those voters whose applications were unmatched due to state error, and through no fault of their own, the applicants will now have to go to an election office within forty-eight hours of casting a provisional ballot. Within this short-window of time, the applicants will have to verify not only that the state made a mistake, but also confirm their application information to the satisfaction of an election official in their county. However, if the state determines that an applicant’s own mistake led to the non-match, that applicant will never have a chance to cure her mistake after voting provisionally even if she presents indisputable documentary evidence of her eligibility. Subsection 6’s burdensome requirements are all the more troubling because, as noted earlier, the state does not even have a uniform procedure in place to determine whether a mistake was made by the state or by the applicant herself.
To justify these burdensome requirements that have already disenfranchised over 14,000 Florida citizens, the state has advanced two interests: preventing voter fraud and maintaining the integrity of the electoral process. The state contends that Subsection 6 “secures to lawful voters the exclusive enjoyment of their political privileges” and that voter registration fraud “poison[s] the whole sphere of citizen participation in a representative democracy.” (Appellant’s Br. at 43.) "While both of these are compelling interests, Subsection 6 is not narrowly drawn such that its restrictions on the right to vote pass constitutional muster. In effect, Subsection 6 secures only to some lawful voters the *1188 exclusive enjoyment of their political privileges while denying that very same right to other lawful voters. And if voter registration fraud poisons the very fabric of our representative democracy, then Subsection 6 is just as poisonous in denying otherwise eligible voters a chance to have a voice in our democracy.
The state’s argument that Subsection 6 is the “only reliable barrier” (Appellant’s Br. at 40) in preventing certain voter fraud practices is completely unsupported. There is nothing “essential” about a registration system that deprives thousands of otherwise eligible voters of a fundamental right, and it is definitely not the only means of ensuring reliability in the integrity of elections. The state could simply require photo identification to achieve the same end.[30] Or, as in California, Florida could simply issue a unique identifying number to unmatched applicants and thus provide a reasonable safeguard for voters who are unmatched but otherwise eligible to vote. See CabCode Regs. tit. 2, § 20108.70(c) (“If a driver’s license or state identification number cannot be identified or verified through [the matching database] and the registrant is otherwise eligible to vote, then a unique identification number shall be issued ....”); see also id. § 20108.38(c). If the vast majority of other states do not have a matching scheme, how are they able to conduct legitimate and functional elections?[31] By imposing an unduly severe restriction on Florida citizens’ right to vote, the state has turned back the clock on the fundamental right to vote by disregarding the constitutional safeguards enacted to prohibit precisely the types of unlawful restraints embodied in Subsection 6.[32]
*1189 V. Conclusion
The right to vote is a “fundamental political right, because preservative of all rights.” Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Florida’s matching requirement under Subsection 6, despite the state’s contentions, is nothing more than a grave impediment to Florida citizens’ fundamental right to vote.[33] Subsection 6 leaves a large number of otherwise eligible voters without a voice in our democracy, simply because of alphabetical and numerical mishaps.[34] We must not forget that it was only just over fifty years ago that the Supreme Court held the polling tax to be unconstitutional as a qualification for voting[35] and it was only just over thirty-five years ago that the Court upheld Congress’ power to bar literacy tests.[36] Subsection 6, to the extent it acts as an unlawful impediment to voting that disproportionately affects minorities, must be viewed within this framework of past discriminatory practices with respect to voting.[37]
Florida’s matching scheme is not an additional safeguard in ensuring the integrity of elections; rather, it is another in a long line of “discriminatory weapon[s]”[38] that have been used to disenfranchise otherwise eligible voters.[39] The state’s goal of pre *1190 venting voter fraud does not make a registration scheme that disproportionately deprives minorities of their right to vote any more legitimate. It is at times such as these that we are reminded of how fragile our rights can be, especially for certain groups which have historically been deprived of certain fundamental rights which our Constitution guarantees to every citizen, regardless of race or ethnicity. It cannot be that accidentally transposing two numbers on a voter registration application is a sufficient basis upon which to deprive an otherwise eligible voter a right which is “too precious, too fundamental”[40] —its fundamental nature stemming from “the equal dignity owed to each voter,” Bush, 531 U.S. at 104, 121 S.Ct. 525, which is “at the heart of our democracy,” Burson v. Freeman, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992).

. Only three other states currently have schemes similar to Subsection 6. Most states that adopted matching schemes have done away with them. For example, after implementing matching schemes, several states— including Pennsylvania, California, and Maryland — abandoned those registration systems after thousands of eligible voters were being denied the right to vote. See, e.g., Cal.Code Regs. tit. 2, §§ 20108.38(c), 20108.65(e), 20108.70(c), 20108.71; Md.Code Regs. §§ 33.05.04.04(A)(3), (B)(3)-(4), 33.05.04.05(C)(5). In Washington State, a district court recently enjoined the state government from enforcing a similar matching *1176 scheme. See Wash. Ass’n of Churches v. Reed, 492 F.Supp.2d 1264 (W.D.Wash.2006).

. This requirement, however, applies only to new voters, not to those already registered prior to the enactment of Subsection 6, treating new voters and "old” voters differently.

. Between the effective date of Subsection 6— i.e., January 1, 2006 — and October 10, 2007, at least 14,326 Florida citizens were excluded from the Florida registration list because of non-verification. As of the November 2006 general election, that number was 12,804.

. For example, African-Americans make up 13% of the applicant pool, but 26% of the unmatched voter pool. Similarly, Hispanic-Americans comprise 15% of the applicant pool, but 39% of the unmatched voter pool. To show the sharp contrast and illustrate how Subsection 6 affects minorities to a much larger extent, whites make up 66% of the applicant pool but only 17% of the unmatched voter pool. Because minority communities often have names that are unfamiliar to data-entry processors, and because they are more likely than whites to have hyphenated or compound names, the database entries are more likely to not match for minorities.

. The matching scheme in itself is problematic because of the numerous administrative and technological barriers, such as computer glitches or human error that make the possibility of non-matches for qualified voters a strong possibility. However, I focus this dissent, primarily the statutory sections, on the fact that if a mistake is made by an applicant who then votes provisionally, that vote will never be counted even if the applicant provides valid documentation — either a driver's license or social security card — which clearly verifies the voter's identity. Most other states do not have this problem. For example, in California, if an applicant cannot be matched to a database but is otherwise eligible to vote, the state can assign that applicant a unique identifying number. Cf. Cal.Code Regs. tit. 2, §§ 20108.38(c), 20108.65(e), 20108.70(c), 20108.71.

. Under Florida law, "[a] voter registration application is complete and becomes the official voter registration record of that applicant when all information necessary to establish the applicant’s eligibility pursuant to s. 97.041 is received by a voter registration official and verified pursuant to [Subsection 6].” Fla. Stat. § 97.053(2).

. Section 97.041 sets forth the "qualifications to register to vote,” which include that a person (1) must be at least eighteen years of age, (2) is a U.S. citizen, (3) is a legal resident of Florida, (4) is a legal resident of the county in which they seek to register, (5) has not been adjudicated mentally incapacitated, and (6) has not been convicted as a felon. Id. § 97.041.

. An applicant may also provide an identification number from a Florida identification card issued pursuant to Florida Statutes § 322.051. Throughout this dissent, I shall refer to "driver’s license numbers” for both driver's license numbers as well as identification card numbers. Driver’s license numbers and social security numbers shall collectively be referred to as "identifying numbers,” “applicants’ numbers,” or "numbers.”

. Although a voter could cure her non-match prior to the registration book-closing deadline, see Fla. Stat. § 97.052, this is not always possible, because voters often receive notices of "incomplete” applications after the book-closing deadline. Furthermore, for a voter who registers, for example, on the last day before the book-closing deadline and the state determines that her application is unmatched, there is no way in which she could cure her non-match prior to the book-closing deadline. In Florida, the book-closing deadline is on the twenty-ninth day before an election. See id. § 97.055. For example, the book-closing deadline for the January 28, 2008 presidential preference primary was December 29, 2007.
The applicant was previously given three days to verify the authenticity of her application but as part of the 2007 amendment to Subsection 6 (s.13, ch.2007-30), the Florida legislature substituted "second day” for "third day,” now giving an applicant only forty-eight hours to provide documentation matching her application information. This amendment took effect on January 1, 2008. The state has sought preclearance of this amendment with the U.S. Attorney General. However, on January 23, 2008, the U.S. Department of Justice informed the state that because the U.S. District Court for the Northern District of Florida had enjoined enforcement of Subsection 6, the proposed change was not ripe for review by the U.S. Attorney General.

. As an additional example, if a blind or otherwise physically-disabled applicant needs the assistance of an election official in filling out her application and an error results on her application, are we to assume that the applicant gave the election official an incorrect sequence of numbers or that the election official simply misunderstood the applicant in transposing two numbers on her application?

. Nowhere in that subsection is there a requirement that the election official verify that the applicant is registered to vote. The majority concedes that this is a "plausible” interpretation of Section 302(a) but chooses to interpret HAVA differently, thereby allowing Florida’s matching scheme under Subsection 6. Given the full purposes of HAVA and the constitutional problems raised by such an interpretation, which the majority ignores, its analysis of provisional balloting under HAVA is much too narrow and incomplete.
The majority takes the position that there would be no reason to have a voter affirm that she "is a registered voter” if anyone eligible to register but who was not successful in registering can still cast a provisional ballot. (Maj. Op. at 1171 n.19.) The majority fails to take into account voter registration processes, where voters all too often do not receive the requisite notice to know whether they have been successfully registered and will go to the polls believing themselves registered to vote. The affirmation requirement under Section 302(a) is distinct from the verification process. It requires that the voter simply claim that she believes herself to be registered, not that the state has in fact registered her to vote.

. I do not address the other two arguments related to HAVA, that (1) Subsection 6 conflicts with Section 303(b)(3)(B) of HAVA and (2) that Subsection 6 violates the purpose and meaning behind HAVA's "Computerized Statewide Voter Registration List Requirements.” While I think these claims have merit, as I noted earlier, the greatest conflict between HAVA and Subsection 6 is the effacement of provisional balloting for a certain group of otherwise eligible voters.

. Contrary to the state’s argument, there is no presumption against preemption. As this court has stated, ”[w]hen considering implied preemption, no presumption against preemption exists.” Irving v. Mazda Motor Corp., 136 F.3d 764, 769 (11th Cir.1998). "Under the Supremacy Clause of the Federal Constitution, the relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for any state law, however clearly within a State’s acknowledged power, which interferes with or is contrary to federal law, must yield.” Lewis v. Brunswick Corp., 107 F.3d 1494, 1502 (11th Cir.1997) (internal quotation marks omitted) (citing Felder v. Casey, 487 U.S. 131, 138, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)).

."For when the question is whether a Federal act overrides a stale law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished — if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect — the state law must yield to the regulation of Congress within the sphere of its delegated power.” Savage v. Jones, 225 U.S. 501, 533, 32 S.Ct. 715, 56 L.Ed. 1182 (1912), quoted in Crosby, 530 U.S. at 373, 120 S.Ct. 2288.

. The majority argues that because Section 303(b) of HAVA only applies to mail-in registrants, Congress left it “entirely” up to the states to decide what the requirements for in-person registrants should be. (Maj. Op. at 1172.) That cannot be the case. A state is not free to enact whatever in-person, or mail-in, registration laws it wants without regard for the underlying purposes of HAVA as well as any provision of HAVA which may conflict with a state’s specific choice of registration laws.

. For purposes of § 1971, "vote” includes "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election.” 42 U.S.C. § 1971(e).

. I do not believe this to be the case as HAVA does not require states to verify an applicant's identifying number. If a state is not required to verify an applicant's identifying number, then HAVA does not automatically make such information material because an individual in a state without a matching scheme could provide her driver's license or social security number and even though she may have transposed two numbers of her application, that immaterial error would not prevent her from voting in that state. Furthermore, the information cannot be per se material because HAVA provides for the assignment of a unique identifying number, which does not have to be matched, for those individuals who do not have a driver’s license or social security number. The information also cannot be per se material if a state such as North Dakota is allowed to hold federal elections without any registration requirements.

. The majority argues that this standard that an error is immaterial if it does not preclude a reasonable election official from identifying the applicant only works if the applicant presents proof of her identity or eligibility. (Maj. Op. at 1175 n.23.) This is simply not true. If all of an applicant's registration information matches a database but for a missing hyphen, this minor error would not preclude a reasonable election official from determining that a voter is eligible based solely on the information provided on the application itself, not based on the applicant presenting additional identifying information. Additionally, the majority argues no error could ever be material if the nature of the error is considered because an election official will always be able to verify the identity of an applicant if she presents additional identifying information. (Id.) This also misconstrues the inquiry. There are certain errors that are of sufficient magnitude that a reasonable election official would not be able to verify an applicant’s eligibility regardless of the additional identifying information provided. For example, if an unmatched applicant wrote "Jos Lopez” as his name on his application but later presented identifying information with the name "Juan Lobo,” a reasonable election official would not be able to determine the applicant's eligibility. The materiality of this error, or the degree to which the new information deviates from the information on the application, is of such magnitude that the applicant could not be registered based simply on the additional identifying information, thereby ensuring that applicants are not fraudulently attempting to register.

.The state argues that the materiality provision only applies to errors or omissions "on any record or paper” whereas this case is *1183 only about errors in the treatment or processing of voter registration applications. This argument is meritless. The state’s interpretation of the materiality provision would lead to the absurd result that the state could commit an inordinate number of errors and omissions and remain immune from challenge under 42 U.S.C. § 1971(a)(2)(B) because the errors or omissions did not occur on the application forms themselves. Under this legal regime, the state would be free to treat and process applications however it deemed appropriate, with no safeguards for voters under the materiality provision. By confining the materiality provision to voter registration application forms, the state is seeking to flout the goals behind the VRA, providing itself "an excuse to disqualify potential voters.” Schwier, 340 F.3d at 1294. The materiality provision applies to errors or omissions on "any record or paper.” Nowhere does the statute define "record or paper” as meaning only application forms.

. The district court did not reach the merits of Plaintiffs' constitutional claims because it found the statutory claims sufficient to grant Plaintiffs’ request for a preliminary injunction. However, the court found that Plaintiffs’ allegations were sufficient to state constitutional claims and therefore, denied the state’s motion to dismiss those claims.

. The Fourteenth Amendment provides, in relevant part: “No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1.

. If applicants do not know what makes their applications "incomplete,” they may go to the Supervisor of Elections’ office without the proper documentation to verify their applications. Being permitted to fax or mail a copy of their documentation to verify their applications would not solve the problem. An applicant might send a photocopy of her driver’s license when the real problem was matching her social security number. The Supervisor of Elections’ office might not even try to match the newly provided driver’s license number to the DHSMV database because that was not the initial problem. Even if it does try, if the driver's license was obtained prior to the applicant getting married and changing her name, or if her driver's license does not include a hyphen whereas the application does, it will still not match. If the applicant receives a second notice that is identical to the first, letting her know her application is "incomplete” or "incorrect,” she will find herself in a vicious cycle of guessing as to what is wrong with her application. This of course assumes that election officials send out a second notice and that there is sufficient time to send out that second notice before the book-closing deadline.

. The state contends that voters can fax or email copies of the required evidence instead of going to the Supervisor of Elections’ office. Plaintiffs, on the other hand, argue that the notices do not contain a fax number or an email address. Moreover, as noted above in footnote 21, faxing or mailing may not solve *1185 the problems arising from a "generic” notice that simply says an application is "incomplete.”

. See Division of Elections, Florida Department of State, Voter Registration: Voter Registration Application, http://election.dos.state.fl. us/regtovote/regform.shtml (last visited Mar. 25, 2008).

. The website simply states what will happen if an application is complete: "If your application is complete and you are qualified as a voter, the Supervisor of Elections for your respective county of residence will send you a voter information card. This card will serve as official notification of your registration. If you do not receive your card within three weeks, or if you have any questions regarding your registration, please call your county Supervisor of Elections.” Id.

.Just above this language, the website lists the qualifications to become a registered voter in Florida, as enumerated under Florida Statutes § 97.041, a provision which does not mention the filing of a mistake-free application as a prerequisite to have an applicant’s vote counted. Id.

. See supra at note 4.

. There is no bright line separating a permissible election-related regulation from an unconstitutional infringement on First Amendment freedoms. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 359, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); see also Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (noting that there is “no litmus-paper test for separating those restrictions that are valid from those that are invidious” and that there “is no substitute for the hard judgments that must be made”).

. See Crawford v. Marion County Election Bd., 484 F.3d 436, 438 (2007) (en banc) (Wood, J., dissenting) ("Recent national election history tells us ... that disenfranchising even a tiny percentage of voters can be enough to swing election outcomes” [referring to, among other races, the gubernatorial race in Washington State in 2004, which was decided by only 129 votes] and “[e]ven if only a single citizen is deprived completely of her right to vote ... this is still a severe’ injury for that particular individual.”).

. When there are less burdensome means to achieve a state's goal of preventing voter fraud, we should be very hesitant to uphold a registration system that decreases the number of registered voters and, as a result, chisels away at "the foundation of our representative form of Government." H.R.Rep. No. 85-291 (1957), reprinted in 1957 U.S.C.C.A.N. 1966, 1977. ("Th[e] right to vote ... is ... the foundation of our representative form of Government. It is the sole means by which the principle of consent of the governed as the source of governmental authority is made a living thing. Deprivation of the right to vote is the first step on the road to tyranny and dictatorship .... [T]he sovereign ... must preserve this fundamental and basic right against any and all unlawful interference.").

. Even within Florida, various groups are not subject to Subsection 6. First, Florida’s matching scheme does not apply to voters registered prior to the enactment of Subsection 6. Additionally, the matching requirement does not apply to those applicants who do not possess a driver's license or social security card. Those applicants do not have to go through the matching process because the state provides them with a separate number. They only have to affirm that they do not possess a driver's license or social security number. See Fla. Stat. § 97.053(5)(a)(5). It makes little sense to devise a registration process that deprives an individual of the right to vote for truthfully providing her driver's license or social security number but whose number is not matched, while at the same time simply assigning a random number to another individual who does not have an identifying number and sparing her from the bureaucratic mishaps of Subsection 6.

. For all of the reasons discussed above, Plaintiffs have demonstrated a substantial likelihood of success on the merits. Furthermore, Plaintiffs have also satisfied the other three factors necessary for a preliminary injunction, having demonstrated that the preliminary injunction is necessary to prevent irreparable injury, the threatened injury outweighs any harm the preliminary injunction would cause to the state, and the granting of the preliminary injunction will not have an adverse effect on the public interest. See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246-47 (11th Cir.2002); Parker v. State Bd. of Pardons & Paroles 275 F.3d 1032, 1034-35 (11th Cir.2001) (citing Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir.1985)).

. Subsection 6 further acts as an additional barrier in promoting higher voter turnout in the United States, where voter participation already lags "well behind” participation rates in other democratic countries. League of United Latin Am. Citizens v. Perry, 548 U.S. 399, 126 S.Ct. 2594, 2640 n. 10, 165 L.Ed.2d 609 (2006) (citing Trevor Potter & Marianne H. Viray, Election Reform: Barriers to Participation, 36 U. Mich. J.L. Reform 547, 575-76 (2003)). Average voter turnout for other democratic countries (in alphabetical order as of 2003): Australia, 82.7%; Austria, 79.6%; Bahamas, 67.6%; Barbados, 66.7%; Belgium, 84.1%; Botswana, 44.6%; Canada, 60.1%; Colombia, 33.8%; Costa Rica, 81%; Denmark, 81.7%; Finland, 71.5%; France, 60.6%; Germany, 72.7%; Greece, 84.7%; Iceland, 88.3%; India, 60.1%; Ireland, 70.2%; Israel, 83.2%; Italy, 90.2%; Jamaica, 46.4%; Japan, 57%; Luxembourg, 60.5%; Malta, 96.7%; Mauritius, 79.8%; Netherlands, 75.2%; New Zealand, 80.4%; Norway, 75.7%; Papua New Guinea, 72.4%; Portugal, 78.4%; Spain, 79%; Sweden, 82.6%; Switzerland, 37.7%; Trinidad and Tobago, 68.8%; United Kingdom, 72.4%; and Venezuela, 49.9%. The average voter turnout for the United States is 44.9%. See Potter & Viray, at 576 n.200.

. Cf. Crawford v. Marion County Election Bd., 472 F.3d 949, 955 (7th Cir.2007) (Evans, J., dissenting) ("The potential for mischief with this law is obvious. Does the name on the ID 'conform' to the name on the voter registration list? If the last name of a newly married woman is on the ID but her maiden name is on the registration list, does it conform? If a name is misspelled on one Schmit versus Schmittdoes it conform? If a 'Terence' appears on one and a shortened 'Terry' on the other, does it conform?”). All of the scenarios laid out by Judge Evans would result in unmatched applications under Subsection 6.

. Harper v. Va. Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

. Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

. Cf. Crawford, 484 F.3d at 438 (en banc) (Wood, J., dissenting) ("In this case, the plaintiffs assert that the state voter identification law is causing the wholesale disenfranchisement of some eligible voters. To the extent that it operates to turn them away from the polls, it is just as insidious as the poll taxes and literacy tests that were repudiated long ago.”).

. Mitchell, 400 U.S. at 147, 91 S.Ct. 260 (Douglas, J., concurring in part, dissenting in part).

. See Crawford, 484 F.3d at 439 ("Finally, this court should not ignore this country’s history. Unfortunately, voting regulations have been used in the not-so-distant past for discriminatory reasons. The law challenged in this case will harm an identifiable and often marginalized group of voters to some undetermined degree. This court should take significant care, including satisfactorily con *1190 sidering the motives behind such a law, before discounting such an injury.”).

. Harper, 383 U.S. at 670, 86 S.Ct. 1079; see also 42 U.S.C. § 1973gg(a)(l)-(3) ("[T]he right of citizens of the United States to vote is a fundamental right,” and "it is the duty of the Federal, State, and local governments to promote the exercise of that right” because "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.” (emphases added)); Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (noting that the right to vote is a "fundamental political right” (quoting Reynolds, 377 U.S. at 562, 84 S.Ct. 1362)); Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) ("[Vjoting is of the most fundamental significance under our constitutional structure.").